[No. 21963.   *En Banc.*   April 17, 1930.]

THE STATE OF WASHINGTON, *Respondent,* v. ARCHIE
FRANK MUCH *(alias James Murphy), Appellant.*[1]

[1]Reported in 287 Pac. 57.

404

*John F. Aiken* and *Justin C. Maloney,* for appellant.
*C. W. Greenough* and *Louis F. Bunge,* for respondent.

HOLCOMB, J.—Appellant was convicted of murder in the first degree, the death penalty assessed by the jury and after denial of his motion for a new trial was sentenced by the trial court in conformity with the verdict of the jury. From the judgment and sentence so imposed, he appeals.

The information in one count charged the crime as having been committed in Spokane county, Washington, on or about September 22, 1928, by appellant, willfully, unlawfully and feloniously, without excuse or justification and with a premeditated design to effect the death of one Catherine Clark with a hatchet held in the hand of appellant, by repeatedly striking Catherine Clark in the head, from which mortal wounds were inflicted of which she then and there died.

On Sunday, September 23, 1928, two residents of Spokane went with their families in their automobiles to an unoccupied ranch known as the "Forquer Place," or the "Davis ranch" in Spokane county, about eighteen miles northeast of Spokane, to pick fruit. Late in the evening, when they were about to return, while one of. them was looking for water in a ravine on one side of which runs a county road which crosses the ravine by a low bridge, he discovered the dead body of a woman a short distance below the bridge, screened from view on either side by bushes and vegetation, who later proved to be Catherine Clark of Boston, Massachusetts.

The Davis ranch is a lonely and unfrequented spot, but appellant had become familiar with it by having been taken to it by one of the witnesses who discovered the murdered woman, about a week prior to the murder. The families hurried back to Spokane and reported their discovery to the sheriff's force. Two deputies thereupon returned to the scene of the crime with the two male witnesses of the party making the discovery. It was then dark, but, by the use of flash lights and the head lights of the sheriff's car, an examination was made of the body and surroundings. The woman had died from blows on the forehead above the nose, which had driven her skull bones into the brain. There were many other bruises and abrasions about the head, face and neck. In fact, her face and head were terribly mutilated. There was a blood splotch within a few feet of the road south of the ravine and five or six more blood splotches visible in the grass between the road and the ravine.

The body had been rolled or dragged through a barbed wire fence between the road and the ravine, which process had left fresh scratches on the legs of the body. Not far from the body, in the bottom of the

ravine, was found a shingler's hatchet, and, as one of the men bent over to observe it, he discovered it was his own hatchet or hand axe, which was a peculiar bent and deformed instrument which this witness had carried in his car. This witness, Tyree, made a startled exclamation upon seeing the hand axe and stated it was his own. He exclaimed, "My God! Winkleblack, that is my hand axe," or "hatchet." The officers then questioned this man and learned that, about a week prior to September 23, appellant had asked for and procured the loan of his car for some time during the week. On Saturday, the 22nd, appellant's little girl came to his place with a note from her father to him asking if appellant could get the car that evening. He consented, and appellant himself got the car that evening, promising to return it in a couple of hours. He did not return it until the next morning. The next morning, upon learning that the owner of the car and his neighbor and families were going up to the old orchard again that day, he endeavored to rent the car again for the day, but without success.

Upon returning to Spokane, the officers and this man who owned the hatchet drove to his home and there searched his car and his home to see if they could find his hatchet, but it could not be found. They then proceeded to the home of appellant at 2217 East Hartson avenue, Spokane, where he had been residing for some time. There they learned that appellant and his wife had gone to a church some blocks distant. On the way to the church, they met appellant and wife returning home. Appellant was taken aside and questioned and admitted to the officers the facts relating to the borrowing or renting of the other man's car.

He then told them a very ingenious and highly improbable story about having met a "Jim," or James Murphy, at Hedlund's mill where they worked, and

had struck up a casual acquaintance with Murphy during lunch hours; that Murphy informed him, about a year later, that he wanted to correspond with women with a view to marriage and desired to have his mail come to appellant's house so that his friends would not know it; that Murphy was to inherit a fortune from the estate of his father on condition that he was married by a certain time; that Murphy had finally got in touch with Mrs. Clark and made arrangements for her to come from Boston to Spokane to marry him; that, under the arrangements, she was to come to appellant's home; that Murphy was not able to meet her upon her arrival and he had borrowed the other man's car and taken Mrs. Clark over into Idaho and had met Murphy and one "Jake," whose other name he did not know, on the road; that they produced some beer and after a drink or two appellant passed out; that he lay alongside his car and did not awake until the following morning; that when he did awake Mrs. Clark, Murphy and Jake were gone; that he then returned to Spokane and returned the other man's car, but made no report to the sheriff or anyone else as to what had happened.

The officers and appellant and his wife then proceeded to appellant's home, and his wife there admitted that appellant had brought back with him from Idaho Mrs. Clark's hat box containing her clothes and belongings. She stated that, after Mrs. Clark's arrival, she was brought to the Moock home by appellant and exhibited to Mrs. Moock a picture of herself in an oval frame and stated to her that it was her bank and that she kept all her money in the frame. Appellant was then taken to the mortuary where he identified the body as that of Mrs. Catherine Clark, whom he had taken over into Idaho. Upon further questioning, he described Murphy as a man about his own size, but light complexioned. He admitted that

he had written one letter to a matrimonial agency in Illinois looking to an enrollment, but denied writing any other letters. He stated that, on Friday night, preceding the murder, a strange boy accosted him on the street who asked him if he were Mr. Moock; that the boy stated he had a letter to deliver to Mrs. Clark and one for Moock; that the letter to Moock advised that Murphy was sick and could not come after Mrs. Clark, and requested Moock to bring her over into Idaho to the place of a Mrs. Carlton, represented to be Murphy's sister, and that there the marriage would be consummated.

On Monday, appellant was taken over into Idaho, where he claimed he and Mrs. Clark had met the alleged Murphy, but was vague and indefinite as to the road. He finally pointed out a spot where he said he had lain all night, but no evidence of such lodging could be found. On September 24, a little girl eight years of age, while on her way to school, found Mrs. Clark's purse under a bush on a street about five blocks from appellant's home. Inside of the purse was the oval picture frame. On September 25, officers went to the home of appellant and searched the garden outside of the house. Digging in two places where the dirt had been freshly disturbed, one of them discovered a package wrapped in a newspaper containing letters which were introduced in evidence at the trial, which were the letters that had been written by the supposed James Murphy from 2217 East Hartson avenue, Spokane, to Mrs. Clark. The other officer, about the same time, discovered another package wrapped in a newspaper buried in the ground containing thirteen $100 bills, one $50 bill, and two $20 bills. This package and the money was received in evidence at the trial. This package of currency, when folded once, fits snugly into the oval picture frame between the picture

and the back of the frame. Two savings bank deposit books, which had been issued in the name of Catherine Clark, were also found in the hat box, which showed withdrawals of balances aggregating an amount that, after deducting the reasonable expense of her trip from Boston to Spokane, would approximate the $1,390 found in appellant's garden.

Appellant admitted that he sent two money orders to the matrimonial agency for catalogs and wrote the two letters therefor. As to the letters of the alleged Murphy to Mrs. Clark, appellant claimed that Murphy always brought him the originals of the letters and appellant copied them for Murphy so that they would never be in Murphy's handwriting in the event of a breach of promise suit against Murphy. He claimed that he had written most of them in Murphy's car parked under a railroad viaduct or at Manito Park, and admitted that he had written the last letter to Mrs. Clark, which he claimed the messenger boy had brought him, at Liberty Park on his way home.

All the responses to the letters written over the name of James Murphy were received at the home of appellant above given. Appellant testified that all of them had been turned over to Murphy by him. Appellant stated that Murphy claimed that his father had died and left him $100,000 to be given to him when he produced a wife and $10,000 in cash, and set a date not far distant from the writing of the letters, in which these conditions should be fulfilled or the $100,000 would be lost. He said Murphy claimed to have saved $8,300 at the time of writing a certain letter dated July 2, 1928, and stated in that letter that he thought he would be unable to raise the balance of $1,700 and had decided to seek a wife who would loan the remaining $1,700 for a few days, and that, after receiving the $100,000, Murphy would give five times the $1,700

loaned to him to the woman, for her own private account, who would furnish that money and marry him.

Appellant had been working at the Hedlund mill in Spokane for about two years at a daily wage of about $3.60. He was a native of Canada, of German descent, and had not become naturalized here. He is about 34 years of age and has a wife and five small children.

Apparently, no one could be produced, for no one was produced, who could testify to ever having seen James Murphy in the Hedlund mill in Spokane; nor any other person, with the exception of the wife of appellant, who testified that appellant had pointed out a man to her once whose back was toward them and who was some distance away, who she said, he told her was James Murphy. He had also apparently informed his wife of the supposed transactions with Murphy, in order to explain the writing and receipt of the James Murphy letters at their home. Apparently, his wife was as much deceived thereby as was his victim.

The killing was one of fiendish atrocity and had undoubtedly been long and coldly planned.

If appellant committed this crime, as the evidence and circumstances almost unerringly prove, it was committed with a premeditated design to effect the death of the victim and without any excuse or justification as such are defined in the law. There was therefore not the slightest excuse for the giving of the instruction requested by appellant of the lesser degree of murder in the second degree. It was either murder in the first degree, or nothing. *State v. Whitfield,* 129 Wash. 134, 224 Pac. 559, and cases cited. *State v. Bolen,* 142 Wash. 653, 254 Pac. 445. In *State v. Bidwell,* 150 Wash. 656, 274 Pac. 716, appellant had mistaken her remedy. Other cases cited by appellant were upon entirely different conditions.

In the trial of the case, the articles above men-

tioned, discovered at the home of appellant, were received in evidence.

It is contended by appellant that these articles should not have been received in evidence for the reason that they were procured by the officers without the authority of a search warrant in contravention of his constitutional rights, both under the Federal and state constitutions.

In the first place, appellant in his affidavits did not aver, had, and could show, no ownership with possessive rights to any of these articles except, possibly, two paper writings which were not so alleged, without which he could assert no constitutional rights thereto. *Gallagher v. United States,* 6 Fed. (2d) 758.

No statute has been cited, and we can find none, in this state authorizing the issuance of search warrants for the evidence of the instruments of a murder. Several statutes exist providing for and requiring search warrants for the search and seizure of intoxicating liquor, stolen goods, counterfeit coin, gaming apparatus and the like, but none conferring jurisdiction upon any magistrate to issue search warrants, the subject-matter of which is the evidence or instruments of murder. There were circumstances indicating the guilt of appellant at the time of his arrest, and the searches were made by the officers after the arrest.

It is only unreasonable searches and seizures, without probable cause, that are forbidden. *Carroll v. United States,* 267 U. S. 132. That the searches, having been made upon probable cause, uncovered more and convincing evidence of the guilty connection of appellant with the heinous crime, is his misfortune; but it in no wise renders the evidence, so discovered, incompetent. *State v. Evans,* 145 Wash. 4, 258 Pac. 845; *State v. Beaupre,* 149 Wash. 675; 271 Pac. 26;

412

*State v. Estes,* 151 Wash. 51, 274 Pac. 1053. See, also, *State v. Britton,* 137 Wash. 360, 242 Pac. 377, 247 Pac. 9; *People v. Chiagles,* 237 N. Y. 193, 142 N. E. 583, 32 A. L. R. 676, and notes thereto.

The next contention of appellant is that the evidence in the record is devoid of any positive proof and the judgment rests entirely upon circumstantial evidence which is conflicting in many respects.

While the evidence is conflicting, the jury were not bound to believe the evidence of appellant, and, as has been said, the circumstances connecting appellant with the crime are so strong that the jury were justified in arriving at their verdict.

During the trial of the case, certain writings were received in evidence consisting of copies, as appellant contends, of the teachings of a certain street preacher whom he had heard five or six times in Spokane. These writings contain some peculiar philosophy, but each one of them was labeled with appellant's own initials. The writing was his own handwriting. They indicated a somewhat perverted view of religion and of the total depravity of womankind. They did not show any past immorality or the commission by him of any past offense; but did show his attitude of mind, that anything he should do would be right. They would, no doubt, exert an influence over the minds of any properly constituted jury. By the use of certain peculiar spelling therein, they strongly indicated that the writing of the James Murphy letters to Mrs. Clark was the same handwriting and identical spelling of the man who copied the so-called lectures of the street preacher. They therefore constituted a circumstance tending to indicate that appellant himself wrote the letters to Mrs. Clark without any copies for his guidance.

We consider the writings relevant, competent and

admissible. 13 R. C. L. 740; *State v. Edelstein*, 146 Wash. 221, 262 Pac. 622.

During the trial, when the state had closed its evidence, counsel for appellant asked the court that the jury be permitted to view the road where appellant was supposed to have met Murphy over in Idaho, called the Pleasant View road, as well as the scene of the crime in Spokane county. The prosecutor made a mild protest against the jury being taken to view the road in Idaho, because it had not been very well identified by appellant. The trip to this road was asked largely because of the difficulty of securing the attendance of witnesses from Idaho to prove the existence of the road and its condition. The court granted the request of counsel for appellant, and, at a convenient time, allowed the jury to be taken to both places in charge of two bailiffs in one conveyance and under careful admonitions. Counsel for appellant apparently did not desire to go, and appellant was not taken. Appellant did not personally consent to the taking of the jury either to the scene of the crime, or over in Idaho, to view the road. Appellant now contends that he could not waive his constitutional rights in making the request for a view by the jury, although his counsel so requested.

It is now contended that this view, in connection with an instruction of the trial court which in part was that

". . . evidence comes only from the witnesses who have testified before you under oath and from the exhibits which have been received in evidence and from no other source, except that you must also consider what you observed in viewing the premises, even though contrary to the testimony of witnesses,"

was erroneous.

Although other courts may have held to the contrary,

this court is committed to the principle that a view of the premises is not a part of the trial. In *State v. Lee Doon,* 7 Wash. 308, 34 Pac. 1103, we held that the jury does not view the premises for the purpose of obtaining evidence; that no evidence is allowed to be offered there to the jury under any rules or any circumstances; they simply view the premises for the purpose of enabling them to make an intelligent application of the testimony presented at the trial. Clearly, there was no confrontation of witnesses against appellant unconstitutionally denied him by such mere view.

We consider that the view of the premises within the state of Washington where the alleged crime was committed was without error and within the discretion of the trial court, and could be demanded by the then counsel for appellant, whereby he would waive any constitutional rights that he might otherwise have.

■■ The visit of the jury outside of this state, in the state of Idaho, presents a different, serious question.

Appellant cites *Jones v. State,* 51 Ohio St. 331, 38 N. E. 79, where the court held that trial courts there were authorized to send the jury anywhere *within the jurisdiction of that state,* to view the property or premises. To the same effect is *State v. Hawthorn,* 134 La. 979, 64 South. 873. In the last cited case, the trial court refused to permit a jury to go into an adjoining state to view movable personal property alleged to have been stolen by the accused in Louisiana. The appellate court merely held that the trial court correctly so ruled.

We can see no resemblance between the act of going over into Idaho by the jury and a stipulation by both parties to proceed with a jury of eleven jurors, as appellant argues, citing *State v. Ellis,* 22 Wash. 129, 60 Pac. 136, to the effect that a stipulation to proceed with

eleven jurors signed by counsel for both sides was invalid. That was because § 21, article I, Washington constitution, guarantees to a defendant the right of trial by jury of twelve men of his peers, which neither he nor his counsel could waive.

Possibly the jury, while in Idaho, temporarily lost their qualifications as jurors, or, collectively, as "the right hand of the court," and became merely private citizens and could have disbanded. However, they did not do so, and returned into the jurisdiction of the court without having separated or disbanded and again became sworn jurors, clothed with authority as such. There is no pretense that anything prejudicial occurred while the jury made the short visit in Idaho. Whatever error there was in this irregularity was invited.

Neither is there any claim based upon any absolute right of appellant to accompany the jury on such trip. Since we held in the *Lee Doon* case, *supra,* that it was no part of the trial, and that appellant in that case was not entitled to accompany the jury, that decision seems to be decisive of that question.

Since there was no actual prejudice occurring to appellant in the slightest degree while the jury were absent from the state for a short time, we conclude that no constitutional rights of his were violated.

We can find no case exactly apt upon this point, but upon reason and principle we consider the contention not well founded.

██ Other errors claimed relate to the admission of the evidence as to what the witness exclaimed upon discovery of the body of the slain woman, as hearsay.

This falls under the rule as to spontaneous exclamations and is sufficiently closely connected in time as to be considered *res gestae.* Moreover, the woman was surely murdered, but the exclamation contained no

intimation of appellant's guilt, and there was nothing prejudicial to him in it.

Appellant also contended that errors were committed in the refusal of certain requested instructions. All the requested instructions and the instructions given by the court have been carefully examined. This is not a mere cursory and casual disposition of these claims. The instructions given by the trial court were exceptionally terse, lucid and to the point. They stated the law correctly. The substance of the matters desired to be submitted in the requests made by appellant was given in the instructions, with the exception of the instruction on murder in the second degree, which had not the slightest basis in the evidence or circumstances for submission to the jury.

We therefore conclude that the verdict and the sentence must be affirmed. It is so ordered.

MILLARD, FULLERTON, PARKER, MAIN, BEALS, and TOLMAN, JJ., concur.

MITCHELL, C. J. (dissenting)—I dissent from those portions of the majority opinion relating to the instruction on the subject of view of the premises by the jury, and the trip of the jury into the state of Idaho. A view of the premises with respect to the trial of cases is provided for and regulated by Rem. Comp. Stat., § 344, which is essentially the same, for present purposes, as the statutes upon that subject in most of the other states. The application of the statute in felony cases has caused a large number of decisions in the different states from the viewpoint of the defendant's right to be present when the view is made. Many of the cases have been collected in note 1, page 667, vol. I, Cooley's Constitutional Limitations, eighth edition, and in subdivision ''e'' of the note to *People v. Thorn,* 156 N. Y. 286, 50 N. E. 947, 42 L. R. A. 368.

There appears to be considerable conflict of opinion on the subject which, as we understand the cases, arises from a consideration of the purpose and scope of the view by the jury—that is, whether the view is only for the purpose of enabling the jury to understand the relative weight of conflicting testimony, or whether the view shall have the force of substantive evidence.

In the case of *State v. Lee Doon,* 7 Wash. 308, 34 Pac. 1103, relied on by the majority opinion here, the instruction, if any, given to the jury either at the time it made the view or finally is not set out. This court simply discussed generally the right of a defendant to be present during the view, and, upon saying that such view was not a part of the trial, and that,

"The jury does not view the premises for the purpose of obtaining evidence, . . . they simply view the premises for the purpose of enabling them to make an intelligent application of the testimony presented at the trial,"

held that there was no error in permitting the view in the absence of the defendant. While the decision does not say so, we think the rule it announces is a correct understanding of the purpose of our statute upon the subject of a view of the premises by the jury. However, that case does not control this one. In this case the jury was instructed that:

". . . evidence comes only from the witnesses who have testified before you, under oath and from the exhibits which have been received in evidence and from no other source, *except that you must also consider what you observed in viewing the premises even though contrary to the testimony of witnesses.*"

I have italicized that which in our opinion takes this case out of the decision in the *Lee Doon* case, *supra.* By it the jury was told in effect, as it was at

liberty to believe and must have thought, that there were three kinds of evidence, namely, testimony of witnesses under oath, exhibits introduced in evidence and things they observed in viewing the premises; not that they should bear in mind what they observed in viewing the premises for the purpose of enabling them to make an intelligent application of the testimony of witnesses under oath and of documents introduced in evidence, but to be considered by them even though *contrary* to the testimony of witnesses.

The theory of the *Lee Doon* case, that ''No evidence is allowed to be offered there to the jury under any rules or any circumstances; . . . '' is wholly unimportant and inapplicable in the consideration of a case where, as here, the jury was instructed that the things they observed in making the view, spoken of by the authorities as mute witnesses, should be considered even though contrary to the testimony of witnesses. The instruction, speaking of things observed, although contrary to the testimony of witnesses, includes of course the testimony of witnesses for the defendant. Surely, under the circumstances, there can be no escape from the conclusions that the latter part of the instruction was contrary to the purpose and intent of Rem. Comp. Stat., § 344, and the rule of the *Lee Doon* case, *supra;* and that, in making the view, there was in legal effect the taking of testimony in the absence of the defendant, from which prejudice and reversible error must be presumed without the necessity of attempting to make any affirmative showing on the part of the defendant of prejudice.

Still another view of prejudice concerning the instruction relates to the time it was given. Had it been given before the jury was sent to view the premises, the defendant, seeing the dangerous and far-reaching effect of it, would have had an opportunity to with-

draw his request that the jury make the view, or else insist upon the right to be present when the view was made. On the contrary, the instruction was not given until after the view was had, when of course there was no chance for the defendant to meet the error or prejudicial effect of the instruction in connection with the view.

Sending the jury outside of the state to view the premises also constituted reversible error. The trip into Idaho was not incidental to a view of other premises in this state, but the jury was sent several miles into that state to view premises in that state. No case directly in point has been found. The case of *Jones v. State,* 51 Ohio St. 331, 38 N. E. 79, mentioned in the majority opinion, was a homicide case tried on a change of venue. The question arose as to the power of the court to send the jury to the county in which the case arose to view a place where material facts occurred. Precisely what the court said in considering the statute authorizing a view by the jury was:

"The words are broad enough to authorize a jury to be sent anywhere, and no reason is apparent why a jury might not be sent to any place where a material fact occurred, *if* within the jurisdiction of this state."

*People v. Bush,* 71 Cal. 602, 12 Pac. 781, was tried on a change of venue, and the question arose as to the court's authority to order the jury to view the premises in the county where the homicide took place, and, in speaking of the statute for a view of the premises by the jury, the court said:

"This right is there given whether the place or places to be viewed lie in the county where the cause is then on trial, or in any other county of this state."

A decision in Nebraska was to the same effect, *Beck v. Staats,* 80 Neb. 482, 114 N. W. 633, 16 L. R. A. (N. S.) 768. True, as stated in the majority opinion, in the

case of *State v. Hawthorn,* 134 La. 979, 64 South. 873, the appellate court held that the trial court was right in refusing a request to send a jury into another state to view property involved in the case. The reason for that holding was:

"The jury, as such, could not have exercised its functions in another state, where also it would have been beyond the supervision and control of the court."

In the present case, the majority opinion says that possibly the jury, while in Idaho, lost their qualifications as jurors, became private citizens and could have disbanded. In my opinion there is no doubt of it, the jury could not function in another state. That ended the trial. To say that what was a jury in the commencement of this trial could go beyond the territory of this state, lose their qualifications as jurors, there acquire information dignified by the subsequent instruction of the court as worthy of consideration though contrary to the testimony of witnesses, come back to this state, "again become sworn jurors" and then find the defendant guilty of a felony, is in our opinion fundamentally unsound. After the jury lost their qualifications as jurors by going over into Idaho, they never became jurors thereafter, they could not render a valid verdict. It is not a question of error without prejudice, or that imposes on the defendant the burden of showing prejudice. On the contrary, the error was fundamental, not capable of repair. It was a matter of the lack of power or authority in the jury to render any verdict whatever.

FRENCH, J., concurs with MITCHELL, C. J.