[No. 4617–1. Division One. May 23, 1977.]

THE STATE OF WASHINGTON, *Respondent,* v. DOUGLAS MACARTHUR THOMPSON, *Appellant.*

*David G. Laidman* and *Bruce MacLean,* for appellant (appointed counsel for appeal).

*Christopher T. Bayley, Prosecuting Attorney,* and *Michael P. Ruark, Deputy,* for respondent.

JAMES J.—At jury trial, Douglas Thompson was convicted of first–degree murder. Counsel for Thompson seeks reversal on the general theory that Thompson was either insane or too drunk at the time of the crime to have been guilty of first–degree murder. He also argues that certain

testimony should not have been excluded as hearsay. Thompson has filed his own supplemental brief challenging the admissibility of certain evidence discovered by police as the result of a search and seizure, challenging certain in-court identification testimony, and attacking a reference at trial to his alleged commission of another crime. We affirm.

On September 26, 1975, Thompson and a young woman who worked for him set out from Tacoma to Edmonds. She testified that he wanted her to sell amphetamines for him. He testified that they went there so that she could collect money that she owed him. They spent the day in the Edmonds area, for the most part wasting time. They spent some time in a tavern drinking beer and shooting pool. Later, they went to a bowling alley. Around 5 or 5:30 p.m., she dropped him off at a tavern and went to visit a friend. Upon arriving at her friend's home, she noticed a shotgun in the car as she was getting her guitar out of the back seat. She entered the home. Her friend, Dick Wylie, and two other males were present. One was Wylie's roommate, who left somewhat later to go to a liquor store.

After consuming four glasses plus two pitchers of beer and a hamburger, Thompson went looking for the woman. He found his car and entered the home. He tried to get the woman to leave with him, but she refused. A loud argument ensued between Thompson and the woman. Eventually, he grabbed her and dragged her into the street where the altercation was viewed by a neighbor. Wylie intervened, whereupon Thompson threatened to shoot him with a pistol. At this time, Wylie's friend, who had gone to the liquor store, returned. He and Wylie then succeeded in calming down Thompson. The four persons reentered Wylie's home. Over a drink, it was determined that the woman would leave with Thompson. When they left, Wylie's friend copied down the license number of Thompson's car.

Thompson and the young woman retrieved the drugs they left earlier that day with some people in Edmonds. At

that point, she stated that he told her that he had some-thing to do that must be done. He told her that it would hurt her. She left the car and he drove away.

Wylie, his friend, his friend's sister and her friend were seated in the living room at Wylie's home. There was a knock on the door. Wylie answered it and was greeted by a shotgun blast. Wylie's friend ran to the door where he saw the gunman holding a shotgun and aiming it at him. He backed away. The man then fired two more blasts into Wylie's body and left. The friend, his sister, and her friend were able to identify Thompson in court as the gunman. The neighbor who witnessed the earlier altercation identi-fied Thompson in court as the man she saw emerge from the home carrying a gun after the shooting. Another wit-ness, who arrived at the home at the time of the shooting, also identified Thompson in court as the gunman.

Thompson denied shooting Wylie. He testified that, after the woman left his car, he drove to a tavern in Burien. He consumed a pint of rye en route. He stated that his recol-lection of the drive was "kind of fuzzy." Upon leaving the tavern, he drove directly home where he was arrested.

Thompson first contends that the trial judge erred when he refused his proposed instruction on second–degree mur-der. Thompson argues that there was substantial evidence of intoxication raising a serious question as to whether he was capable of formulating the intent necessary to commit first–degree murder. We do not agree.

There is evidence of drinking over a period of many hours: two beers in a tavern while shooting pool in the early afternoon, two beers at a bowling alley, four glasses plus two pitchers of beer at a tavern, two mixed bourbon drinks at Wylie's home, and a pint of rye whiskey consumed en route to a tavern in Burien. The critical factor, however, is not the quantity of alcohol consumed—rather, it is the intoxication experienced. The only evidence of intoxication was Thompson's assertion that his memory of the drive to the tavern in Burien was "kind of fuzzy" and that he only remembered patches of the drive. This does not constitute

substantial evidence of intoxication. Absent substantial evidence of incapacity to formulate the requisite intent for first–degree murder, the trial judge did not err in refusing Thompson's requested instruction on second–degree murder. *State v. Rio,* 38 Wn.2d 446, 230 P.2d 308 (1951); *State v. Knott,* 6 Wn. App. 436, 493 P.2d 1027 (1972).

Thompson next contends that he was prejudiced when the trial judge sustained the State's objection to testimony on the ground that it was hearsay regarding a conversation between two defense witnesses at the tavern in Burien. One witness would have testified that, prior to leaving the tavern on the evening of the homicide, he told the other witness to tell Thompson, if Thompson stopped in to the tavern before 10 p.m., to ring him at a certain phone number where he would be playing cards. The other witness would have testified that as a result of this conversation, he checked the time upon Thompson's arrival and noted that it was 10:08 p.m. Since the shooting occurred around 10 p.m., this testimony would have tended to give Thompson an alibi. We agree that the trial judge erred when he sustained objections to this testimony. We do not agree that the error was prejudicial.

To constitute hearsay, the extra–judicial declaration must be offered to prove the truth of the matter asserted in the declaration. The matter asserted in these declarations was that one witness wanted Thompson to call him and that he was going to play cards that evening and could be reached at a certain telephone number until 10 p.m. The declaration was not offered to prove these assertions. Therefore, it was not hearsay. The error was not prejudicial since one witness still testified that Thompson arrived at 10:08 p.m. In addition, the evidence of guilt was so overwhelming that beyond a reasonable doubt the error was trivial and harmless.

Thompson's third contention is that he should have been granted a new trial on the basis of newly discovered evidence after verdict. This newly discovered evidence was

obtained from Thompson's presentence report. In it, a psychologist expressed the opinion that when he tested Thompson, he believed him to be a paranoid schizophrenic suffering from a paranoid delusion. He thought Thompson had difficulty distinguishing the important from the unimportant and that he was probably suffering from a severe mental incapacity. He did not express an opinion as to whether Thompson could distinguish right from wrong at the time of the crime or as to whether Thompson understood the nature and quality of his act. We conclude that the trial judge did not abuse discretion when he denied Thompson's motion for a new trial.

This report does not conclude that Thompson was mentally irresponsible or insane at the time of the crime. The report was conducted months after the crime. In any event, Thompson had been examined by a psychiatrist prior to trial and the defense did not elect to plead insanity or diminished capacity. Thompson did not make a sufficient showing that this newly discovered evidence would probably change the outcome of the trial or that the information could not have been discovered by the exercise of due diligence. *See* CrR 7.6. The trial judge properly denied the motion.

In his supplemental brief, Thompson maintains that he was prejudiced when the trial judge overruled his objection to certain testimony. The young woman who accompanied him that day testified that the purpose of their trip was to sell amphetamines which, of course, is a crime. Thompson argues that this evidence of his commission of an uncharged criminal offense was not admissible. We do not agree.

The evidence was admissible because it was inseparable from the whole deed. *State v. Niblack*, 74 Wn.2d 200, 443 P.2d 809 (1968); *State v. Battle*, 16 Wn. App. 66, 553 P.2d 1367 (1976). It was relevant to show the purpose of the trip to the Edmonds area, the nature of the relationship between Thompson and the woman, as well as the basis of their altercation at Wylie's home, and finally, the basis for the dispute between Wylie and Thompson. The defense did

not request a limiting instruction on the testimony. There was no error.

Thompson also contends that the searches of his home and car by police were unlawful and that the evidence obtained should have been suppressed. We do not agree.

Thompson's mother consented to the search of the home in which they both lived knowing that he was to be placed under arrest for homicide and after being informed of her rights. Thompson consented to the search of his car and he even volunteered to show police where to get the key. There is no evidence of coercion. Consent to search was voluntarily given. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973); *Bumper v. North Carolina,* 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (1968).

Finally, Thompson contends that the in-court identifications should have been suppressed since there had been no lineup and they resulted from impermissibly suggestive procedures. The trial judge, however, permitted inquiry into the nature of the identifications out of the jury's presence and ruled that they were proper. There was no error.

The judgment is affirmed.

WILLIAMS and CALLOW, JJ., concur.

Petition for rehearing denied June 21, 1977.

Review denied by Supreme Court March 3, 1978.