[No. 1804–3. Division Three. August 9, 1977.]

THE STATE OF WASHINGTON, *Respondent,* v. DONALD M. SNOOK, JR., *Appellant.*

*McAdams & Schacht* and *Donald W. Schacht,* for appellant.

*Arthur R. Eggers, Prosecuting Attorney,* and *Carl L. Johnson, Deputy,* for respondent.

MUNSON, C.J.[1]—After a jury trial, defendant was convicted of murder in the first degree. He appeals, alleging four assignments of error: (a) failure of the court to submit his proposed instruction defining second–degree murder; (b) improper admission of his confession; (c) exclusion of testimony of Dr. William Hunter, a psychologist at the Washington State Penitentiary; and (d) failure to grant a change of venue in light of pretrial publicity.

The defendant did not except to any of the instructions given by the court, but did except and assign error to the failure to give three of his proposed instructions.

Defendant's proposed instruction No. 6 was an incorrect definition of murder in the second degree; no error was committed in the failure to give it.

In view of *State v. Roberts,* 88 Wn.2d 337, 343–44, 562 P.2d 1259 (1977), which held that the presumption of murder in the second degree was violative of due process, it is fortuitous that the court did not give defendant's proposed instruction No. 8 which heretofore was the usual presumption instruction.

Defendant's proposed instruction No. 7 did contain all of the elements of murder in the second degree, but the court declined to give it, stating:

> For the record, I have declined to give second–degree murder because it seems to me that the defense is that the defendant didn't intend to kill the victim, but if the jury believes he had no intention or the ability to form an intent to kill, then of course he would be not guilty of first–degree murder, but assuming they don't believe that he's raised a reasonable doubt with regard to this, then it

---

[1]Judge Willard J. Roe, sitting as judge pro tempore, drafted this opinion, which I adopt, except as to the assignment of error going to the failure to submit an instruction defining murder in the second degree and a verdict form thereon.

seems to me that reasonable minds could not differ but what the circumstances of the strangling were such as to be premeditated murder. I don't see how it could be otherwise. So for that reason I have declined to give second.

This conviction is based principally upon a recorded statement given by the defendant the day after the victim was assaulted. The court, at a CrR 3.5 hearing, found the statement to have been voluntarily given and permitted the jury to listen to the recording which, in pertinent part, relates the following interrogation:

MR. FLOYD: With these rights in mind you wish to talk to us?

MR. SNOOK: Yes.

MR. FLOYD: This conversation of course will be concerning Mr. Brookshire and a strangling that occurred here in the seg wing of the penitentiary yesterday.

. . .

MR. FLOYD: Would you in your own words relate what happened there yesterday involving yourself and Mr. Brookshire?

MR. SNOOK: Well, the night before I asked him to come out into the yard with me, and when he came out to the yard with me the next day, I lured him down there, opened my door so that it would block the view.

MR. FLOYD: Is that the view of the officers on duty?

MR. SNOOK: Yes. So I blocked the view. Then I got him down there through luring him, showing him the way to play nut–roll, and when I got him down there I first started putting my arm around his neck, caught him by the—like this, told him he had payback coming.

MR. FLOYD: Now, payback, that means something of settling of a grudge, is that what you are talking about?

MR. SNOOK: Yes. And then at that time I started putting my arm around his throat and started choking him that way, and he started faking it on me which made me mad.

. . .

MR. FLOYD: Are you right–handed?

MR. SNOOK: Yes. He faked it on me at first, faked like he was passing out or something, so it kind of teed me off, so I bashed his head up against the bars, and then I threw him back on the floor and he hit his head again.

. . .

MR. FLOYD: Okay.

MR. SNOOK: And I bashed his head against the wall. I went down. I grabbed his windpipe and took it over to the right side of his neck and put my fist in the cavity and held his windpipe there and started choking him some more. I thought he might be faking it on me again so I brought my knee down into his ribs and brought my knee back up while I was still choking him and brought it down on his chest cavity. And I continued doing this. Then the officer called for time for lockup, and I yelled that I was in my cell, and they said, "Brookshire," and I tried to fake his voice and say that I was in. Apparently they knew he wasn't in, and a couple minutes or so later they came down the tier. They got in front of my cell or somewhere around there, and I got off him and ran down to my cell.

. . .

MR. FLOYD: This thing yesterday you say you planned to lure him down out of the sight of the other officers by opening your door and this is where you were doing it?

MR. SNOOK: Yes.

MR. FLOYD: When you took ahold of him or started choking him, did you intend at that point to kill him?

MR. SNOOK: I definitely did, and I still definitely think he'll die. I did too much harm for any human to live.

. . .

MR. FLOYD: When you was choking Brookshire, did you find him hard to handle physically for you?

MR. SNOOK: Not at all.

MR. FLOYD: Is there anything else that you would like to add to this at this time?

MR. SNOOK: Be best that he dies now. I think it's best that he suffers a little bit beforehand. I also think that it's best that he dies now than when he comes back.

MR. FLOYD: You are saying that if he did come back and you got an opportunity you would try him again?

MR. SNOOK: I would succeed next time. I would break every bone in his body.

Our review of the record convinces us that the confession was corroborated in several respects sufficient to support the verdict of murder in the first degree.

The defendant testified he had previously had difficulties with the victim while they were both in the mental health

unit of the institution hospital. He also stated that, both at the time of the attack and when he gave the recorded statement, he was on a mental high as a result of having taken "3200 mg. of equanil and about 1200 mg. of lithium bicarbonate" which he had accumulated from a prescription by the prison psychiatrist of a daily dose of 800 mg. equanil and 300 mg. of lithium bicarbonate, each four times a day. The State did not refute this testimony. The defendant further testified on direct examination that:

Q What happened?

A I went down there and just asked him why he threw the urine on me, and he used profanity, like I said.

Q What happened then?

A Well, the next thing I knew I had grabbed him, and I wasn't totally aware of where I grabbed him, but I was aware that I had him.

Q What were you doing? What do you mean grabbing him? Were you hitting him or choking him or twisting his arm, or what were you doing, do you know?

A Choking him.

Q Okay. What happened then?

A When the officer came to the tier, I snapped to a little bit and I got up and I came on the tier.

Q Okay. And who were the officers that you saw?

A Officer Blackmore and Officer McSwain.

Q And so their testimony about coming down the tier and seeing you come out of 17A is that essentially correct?

A Essentially.

Q You saw them and that's where you had come from?

A Yes.

Q So what did you do at that time?

A I asked them what was going on. They told me it was time to go in my cell.

Q Did you go to your cell?

A Yes, I did.

Q Where was Mr. Brookshire at this time?

A He was still in 17A.

Q What was his condition, do you know?

A I wasn't really completely aware of his condition. I heard him yell for a gurney, and Officer Blackmore came down to my cell a couple of times and looked at

me, and I asked him what was wrong, and he told me that Mr. Brookshire was having a seizure.

He also testified to having spent several years in mental institutions and having tried to get a "C.I. jacket", *i.e.*, a criminally insane jacket, so he could be returned to a mental institution. In this context, he testified:

Q Okay. What relation does that have to talking to Detective Floyd?
A The way that it was brought out on the tape it was put in a form where I seemed somewhat cold-blooded and enjoyed the fact that this happened and different things like this.
Q Was that in fact the case?
A No, it is not.
Q Did you intend to kill Mr. Brookshire?
A Definitely not.
Q You admit making the tape however?
A Yes.
Q You admit saying the things you said on the tape?
A Yes.

Both the officer who had escorted the defendant to the hospital for an examination after the strangulation and the detective and other officers in attendance during the recording of the statement, testified that the defendant appeared to be normal and unaffected by any drugs.

In excepting to the failure to give his definition of murder in the second degree, defense counsel advised the court that, in his opinion, there was insufficient evidence for premeditation, particularly in light of the defendant's testimony about the incident and his mental high. The trial court disagreed, and so do we.

The issue squarely presented is: Is the defendant's testimony that he did not intend to kill the victim, coupled with his claim that he was under drugs at the time, sufficient to require an instruction on murder in the second degree, *i.e.*, murder without premeditation?[2]

---

[2]*State v. Colwash*, 88 Wn.2d 468, 564 P.2d 781 (1977), affirming the majority's reversal in favor of the defendant in *State v. Colwash*, 15 Wn. App. 530, 550 P.2d 57 (1976), is not applicable because no manslaughter instruction was proposed in this case.

On direct examination, the defendant stated he choked the victim, but did not intend to kill him. He also admitted making the taped statements the day following the incident. On cross–examination, he admitted choking the victim around the neck, first with his arm, and then with his hands until a prison guard arrived. Although he denied having asked the victim to come out in the yard with him, he later testified that he had asked a guard if he could be out in the yard at the same time as the victim, giving as his reason that it would allow him to be out in the yard an hour earlier than regularly scheduled. He admitted the autopsy indicated he had done a "good job" on the victim, but denied that portion of the statement wherein he related he had "bashed [the victim's] head against the wall," put his fist in the victim's windpipe cavity, or had kneed him in the chest.

The recorded statement, which is corroborated by other evidence, supports the charge and verdict of murder in the first degree. The defendant's denial of any intent or design to effect the death of the victim does not support the giving of an instruction on murder in the second degree. *Cf. State v. Thompson,* 17 Wn. App. 639, 641–42, 564 P.2d 820 (1977). At best, that denial puts in issue two elements of murder in the first degree, *i.e.,* premeditated design to effect the death. Had the jury believed the State had not met its burden of proof on these elements, based on the instructions given, they would have been required to acquit the defendant.

Furthermore, if the defendant had submitted an instruction on manslaughter and had argued his inability to form a design to effect death because of his "mental high," the result of his ingestion of drugs, he would have been within the language of *State v. Colwash,* 15 Wn. App. 530, 550 P.2d 57 (1976). There is no doubt that this defendant's actions which were neither excusable nor justifiable, caused the death of the victim. Having requested no instruction on manslaughter, that avenue is closed.

■ An argument not clearly articulated, but available, is that the State's proof as to murder in the first degree also, of necessity, includes proof of murder in the second degree. *Cf. State v. Roybal*, 82 Wn.2d 577, 583, 512 P.2d 718 (1973). But as noted in *State v. Much*, 156 Wash. 403, 410, 287 P. 57 (1930):

> If appellant committed this crime, as the evidence and circumstances almost unerringly prove, it was committed with a premeditated design to effect the death of the victim and without any excuse or justification as such are defined in the law. There was therefore not the slightest excuse for the giving of the instruction requested by appellant of the lesser degree of murder in the second degree. It was either murder in the first degree, or nothing.

*Cf. State v. Biondic,* 47 Wn.2d 593, 595, 288 P.2d 845 (1955).

It is not the province of the court or the jury to compromise the degree of crime when the only issue raised by the defendant's testimony was his lack of a design to effect the death of the victim. By returning a guilty verdict of murder in the first degree, the jury obviously disbelieved him. There is evidence to support that verdict; we affirm.

Defendant's second assignment of error is that his confession was improperly admitted. He claims that he was under the influence of drugs and thus unable to understand and appreciate the *Miranda* rights; hence the confession was not freely and voluntarily given.

The record reflects that the defendant requested to talk to the officers. The confession is articulately and logically made, indicating a clear mind. Detective Floyd, the officer who recorded the confession, testified that defendant was in control of himself and did not appear to be under the influence of medication. The confession corresponds with the facts of the death adduced by other evidence.

In his testimony, the defendant stated that at the time he talked to Detective Floyd he was still on equanil and lithium bicarbonate and "at nighttime they were giving me a double barrel. Q Meaning what? A Thorazine." The only

evidence that he was on a medication was that given by the defendant himself. It was further revealed in his testimony that he sometimes saved up his drugs in order to get a "high." There was no expert testimony as to the effect of these drugs upon the defendant; only speculation and the defendant's conclusory testimony.

The trial court was satisfied that the confession was voluntarily made after *Miranda* warnings were given and was not made while under the influence of drugs. Based upon the above facts, as revealed by the record, we find there is substantial evidence upon which the trial court could find by a preponderance of the evidence that the confession was given voluntarily. There was no error.

Defendant's third assignment of error relates to the refusal of the trial court to admit the testimony of a Dr. William Hunter, a psychologist at the Washington State Penitentiary. Dr. Hunter had no knowledge of the incident itself. He knew both the defendant and the victim and had, on occasion in the past, treated the victim for behavioral problems. The offer of proof indicated he would have testified that the victim apparently had behavioral problems in the past which *might have been* relevant as to whether the homicide was justifiable. Since the defense of justifiable homicide was not urged, behavioral problems, if any, of the victim would not be material.

The trial court recognized that if the defense did attempt to justify the act, Dr. Hunter's testimony might become material. The door was not totally closed. After the defendant had testified, there was no renewal of the request to have Dr. Hunter testify. This court finds no abuse of discretion by the trial court in excluding such evidence. *State v. Bell,* 83 Wn.2d 383, 518 P.2d 696 (1974); *State v. Johnson,* 12 Wn. App. 548, 530 P.2d 662 (1975).

Lastly, the appellant urges that the trial court erred in failing to grant his motion for a change of venue in light of pretrial publicity relating to the incident. We have carefully read all of the newspaper articles which formed the basis of the defendant's motion for a change of venue. They are

factual and included little evidentiary matter except that death was by strangulation and that the victim and the defendant were housed in the segregation unit of the Washington State Penitentiary. There is nothing inflammatory toward the defendant, nor is there anything in the articles relating to him which was not admitted at the trial. There are no comments as to guilt or innocence and no reference to defendant's past criminal record. There are, however, references to the victim's past criminal record.

■ As stated in *State v. Crudup,* 11 Wn. App. 583, 586, 524 P.2d 479 (1974), due process of law requires the granting of a motion for a change of venue when there is a probability of prejudice shown. Actual prejudice need not be shown. Where the circumstances involve a probability that prejudice will result, it is to be deemed inherently lacking due process. *State v. Stiltner,* 80 Wn.2d 47, 54, 491 P.2d 1043 (1971). The trial court's decision on a motion for a change of venue will not be disturbed absent an abuse of discretion. The nine criteria are set out in *State v. Crudup, supra.* In that case a motion for change of venue was denied, even though the news articles, as outlined in the opinion, were much more inflammatory than in the instant case. Defendant did not exhaust his peremptory challenges in *Crudup,* nor in the case at bench. We find no probability of prejudice and no abuse of discretion in denying defendant's motion for a change of venue.

Judgment is affirmed.

McINTURFF, J., concurs.

ROE, J.* (dissenting)—Because I believe that in this case an instruction on second–degree murder as a lesser–included offense should have been given, I feel compelled to dissent as to assignment of error (a), while concurring in the balance of the majority opinion.

---

*Judge Willard J. Roe is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

RCW 10.61.006 provides that a defendant may be found guilty of an offense, the commission of which is necessarily included within that with which he is charged. *State v. Dolan,* 17 Wash. 499, 50 P. 472 (1897). *See State v. Miller,* 5 Wn. App. 422, 425, 487 P.2d 640 (1971), where the court stated "[W]hen the evidence will support a conviction of either grand larceny or of petit larceny, the jury must be instructed as to both offenses, . . ." citing authorities. Laws of 1909, ch. 249, § 140, p. 930 defines murder in the first degree as: "The killing of a human being, . . . committed either— 1. With a *premeditated design* to effect the death of the person killed, or of another; . . ." (Italics mine.) Laws of 1909, ch. 249, § 141, p. 930 defines murder in the second degree as: "Committed with a *design* to effect the death of the person killed or of another". (Italics mine.) Thus, the difference between first– and second–degree murder is the element of *premeditation.*

It would seem to me, therefore, that if there is evidence upon which a jury could find lack of premeditation when the defendant is tried for first–degree murder, the instruction on second–degree murder should be submitted.

There was abundant evidence of premeditation in this case, as set out in the majority opinion, but the critical evidence of premeditation was the admission by defendant Snook, himself, in a taped confession which was admitted in this trial. There were no other witnesses to the crime and no weapon.

However, when the defendant testified at the trial, he repudiated that statement and further stated he did not intend to kill and that he was under the influence of drugs. He mentioned that he was on medication, equanil or meprobamate and lithium bicarbonate. There was evidence that these drugs were available to him, that he saved them up, and that their effect would be to numb the mind and give him a mental high.

It would appear to me that this testimony would thus make it a jury question, whether there is premeditation or lack of it.

The only testimony which the State relied upon to limit the instructions to murder in the first degree originated with the defendant. When the defendant repudiated that statement, it then became a question of fact whether he is more believable in his pretrial confession or in his testimony at the trial. If the jury believed the live witness rather than his pretrial confession, it could find no intent and thus no premeditation or design. It was a disputed question of fact as to intent and premeditation. The jury could have believed such trial testimony.

In fact, if the jury found the defendant had totally impeached himself by his inconsistency, then there might not be a scintilla of evidence of premeditation.

With the trial court's refusal to instruct on second-degree murder, the defendant was not given an opportunity to have that issue resolved, and he was deprived of his right to argue his theory of the case. I believe this is error compelling reversal.

As the majority correctly points out, in order to demand the instruction on the lesser-included offense, there must be some substantial evidence to support it. In *State v. Zamora*, 6 Wn. App. 130, 132, 491 P.2d 1342 (1971), the definition given is "that character of evidence which would convince an unprejudiced, thinking mind of the truth of the fact". In that case the court held there was not substantial evidence of intoxication because the testimony of a lay person that the defendant appeared incoherent and stumbling was insufficient. There was no testimony as to the amount of alcohol ingested. There was also other evidence of the crime.

In the case at bench where the confession is the pivotal evidence upon which premeditation rests and where the crime was not witnessed by anyone, the repudiation of the confession, coupled with the evidence of drugs, would raise a substantial question.

It would serve no purpose to extend this dissent by reference to the various cases and treatises on the reliability or

unreliability of confessions and the reason for the strict rules surrounding their admissibility.

The majority cites *State v. Much,* 156 Wash. 403, 287 P. 57 (1930). In that case the evidence was entirely different. The officer investigated the death, found the body, and statements and exclamations of the defendant were used in trial. The case did not rest upon a confession or a repudiation thereof.

*State v. Thompson,* 17 Wn. App. 639, 564 P.2d 820 (1977), was also mentioned wherein the court held that, where the only evidence of intoxication was the defendant's own assertion that his memory was kind of fuzzy, such evidence did not amount to substantial evidence of intoxication. There was a plethora of other evidence to show the commission of the crime; the conviction did not depend on a confession.

Nor is it an answer to the pertinent question to say that, because the jury found murder in the first degree, that finding foreclosed further inquiry. That argument could be urged in the grand–petit larceny cases, but it is not acceptable here. Confronted with the admitted reality of a heinous murder and the definite choice of acquittal or first–degree murder, it would tax credulity to think the jury would acquit. The jury was given no meaningful alternative.

The question of punishment is somewhat academic: Mandatory life for first–degree murder; 20 years to discretionary life for second–degree murder.

One final point needs comment. As the majority notes, the defendant's counsel may not have strictly followed the rules in excepting to the instructions. The purpose of CrR 6.15(c) is to afford the court the opportunity to correct any error. However, counsel did propose an instruction on second–degree murder. The court was obviously advised of defense counsel's position and declined to give the instruction, citing reasons. This is sufficient to apprise the court of the theory of his case and is adequate upon which to base error. *State v. Colwash,* 88 Wn.2d 468, 564 P.2d 781 (1977).

Accordingly, I dissent.

Petition for rehearing denied September 1, 1977.

Review denied by Supreme Court March 29, 1978.