**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**John M. HAYDEL, Jr., a/k/a "Ice Cream" and "Mugsy",**
**Defendant-Appellant.**

**No. 80–3254.**

United States Court of Appeals,
Fifth Circuit.
Unit A

July 8, 1981.

Virgil M. Wheeler, Jr., New Orleans, La., Herbert Shafer, Atlanta, Ga., for defendant-appellant.

C. Michael Hill, Asst. U. S. Atty., Baton Rouge, La., for plaintiff-appellee.

Before SKELTON *, Senior Judge, and RUBIN and REAVLEY, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The validity of John Haydel's conviction for materially underreporting his gross wagering income for purposes of the wagering excise tax, in violation of 26 U.S.C. § 7206(1), turns on the constitutionality of the government's seizure of his gambling records, for it was primarily by their introduction that he was convicted. The seizure

---

* Senior Judge of the United States Court of Claims, sitting by designation.

is challenged as having been made beyond the premises described on the warrant and as violating Haydel's rights against self-incrimination. Because we find that the search and seizure met constitutional requirements, we affirm the conviction.

Haydel, a bookmaker registered with the Internal Revenue Service, *see* 26 U.S.C. § 4412, was the subject of an investigation by the Federal Bureau of Investigation and the Internal Revenue Service. During the course of the investigation, the government obtained a search warrant authorizing the search of the premises known as 4765 McClelland Drive, Baton Rouge, Louisiana. The object of the search was the seizure of Haydel's gambling records, including accounting, tabulation and "run-down" sheets, ledgers, betting slips and line sheets.

On the day the warrant was executed, the government agents first entered an ice cream store, which bears the municipal address 4769 McClelland Drive, through its side entrance located on Byron Street.[1] The side entrance bore no separate address. They asked for the Haydel residence, and were led through the kitchen and storage areas of the store to an interior entrance to the residence. They thus reached the residence through the entrance that was accessible from McClelland Drive rather than through the Byron Street door that led directly into the residence. During their subsequent search of the residence, the agents discovered the gambling records sought to be suppressed in a cardboard box located under the bed of the defendant's parents.

Haydel was indicted on two counts of illegal gambling, 18 U.S.C. §§ 371 and 1955, and nine counts of filing tax returns that falsely reported material matters, 26 U.S.C. 7206(1). Before trial, he challenged, under both the fourth and fifth amendments, the admissibility of the gambling records discovered in his parents' bedroom. Finding that the search warrant identified the premises to be searched sufficiently to withstand fourth amendment challenge, the district court denied in part the motion to suppress. The district judge, however, agreed that, under the fifth amendment, the records were inadmissible to prove violation of the gambling laws, *see also* 26 U.S.C. § 4424(c), and issued an order suppressing their use in connection with such a trial. 486 F.Supp. 109 (M.D.La. 1980). Those two counts were subsequently dismissed.

Pursuant to a pretrial agreement, five of the remaining counts were dismissed and Haydel stipulated that he had understated his gross wagers by reporting, on Internal Revenue Service Form 730, less than ten percent of the gross wagers he had accepted in his bookmaking activity. Sitting without a jury, the district court found that such an understatement was "material" and that Haydel was guilty of all four counts of violating the applicable tax statute, 26 U.S.C. § 7206(1). Haydel was sentenced to one year on the first count and five years of probation on the remaining three counts.

## I.

■ Haydel first claims that the gambling records were seized in violation of the fourth amendment because the warrant insufficiently described the premises to be searched. Pausing at the threshold, as the agents are charged with wrongfully failing to do, we must first determine whether Haydel had a legitimate expectation of privacy for records secreted in his parents' home and under their bed. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The government has sought unsuccessfully to persuade us that Haydel could not reasonably expect that only he and those who had his consent would gain access to what was there concealed. We reject this narrow confinement to confidentiality.

■ No one circumstance is talismanic to the *Rakas* inquiry. "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning

---

1. A complete description of the premises is contained in Part II of the opinion.

nor the end of ... [the] inquiry." *United States v. Salvucci*, 448 U.S. 83, 92, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619, 628 (1980) (citation omitted). Other factors to be weighed include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises. *See Id.; Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). As the very listing of these factors demonstrates, the expectation must be based on considerations outside of the fourth amendment. *Rakas v. Illinois*, 439 U.S. at 142–145 n.12, 99 S.Ct. at 430–31, n.12, 58 L.Ed.2d at 400–402 n.12.

Haydel's parents had given him permission to use their home and had given him a key. His access, therefore, was for all practical purposes unencumbered. Although he did not reside regularly at his parents' home, he kept clothing there and had occasionally remained overnight.[2] Moreover, he conducted a significant portion of his gambling activities at the home and owned the records that were seized. Although the district court did not explicitly so hold, it is reasonable to assume that Haydel had the authority to exclude persons other than his parents and their guests from the home. Finally, it is clear from his actions that Haydel exhibited a subjective expectation that the contents of the box stowed under his parents' bed were to remain private.[3] *Compare Rawlings v. Kentucky*, 448 U.S. at

105, 100 S.Ct. at 2561, 65 L.Ed.2d at 642, in which the defendant admitted that he had no subjective expectation that the subject of the search "would remain free from governmental intrusion".

Similar factual situations were considered in *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951) and *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Although the method of analysis utilized in these cases does not survive *Rakas, Rawlings* and *Salvucci*, the Supreme Court has endorsed the conclusion that the petitioners in both of these cases had a reasonable expectation of privacy. In *Jeffers*, the authorities searched an apartment owned by the defendant's two aunts and seized a cache of drugs owned by the defendant. The Court in *Rakas* remarked approvingly, that "[s]tanding in *Jeffers* was based on Jeffers' possessory interest in both the premises searched and the property seized." *Rakas v. Illinois*, 439 U.S. at 136, 99 S.Ct. at 426, 58 L.Ed.2d at 396. The defendant in *Jones*, similarly, had permission to use the place searched, the apartment of a friend, had a key to the apartment, and kept possessions there. Except with respect to the owner, Jones had control over the apartment and could exclude others. The Supreme Court, in *Rakas*, specifically observed that it did "not question the conclusion in *Jones* that the defendant in that case suffered a violation of his personal Fourth Amendment rights if the search in question were unlawful." *Id.* at 141, 99 S.Ct. at 429, 58 L.Ed.2d at 400. Accordingly, based on the totality of the circumstances in this case, we hold that Haydel had a legitimate expectation of privacy in the area searched.[4] We must,

---

**2.** At the suppression hearing, Haydel testified that he had unlimited access to his parents' home and stayed there when he and his wife had domestic problems.

**3.** Haydel testified he had the records there both to prevent access by his children and because it "would be the most safest and private place."

**4.** The government argues erroneously that the holding of *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), leads inexorably to the opposite conclusion. The Su-

preme Court there abandoned the doctrine of "automatic standing." While the facts of that case, an allegedly illegal search of an apartment rented by a defendant's mother, are appealingly similar, the Court there held only that it was error "to use possession of a seized good as substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched." *Id.* at 92, 100 S.Ct. at 2553, 65 L.Ed.2d at 628. The case was remanded for consideration of that factual

therefore, determine whether the search was illegal, and contravened the fourth amendment, because the search warrant did not sufficiently identify the Haydel residence.

■ The fourth amendment permits warrants to be issued only "upon probable cause, supported by oath or affirmation and *particularly describing the place to be searched,* and the persons or things to be seized." U.S.Const. Amendment IV (emphasis supplied). Haydel argues that the discrepancy between the municipal address of his parents' home, 5466 Byron Street, and the address listed on the face of the warrant, 4765 McClelland Drive, taints the search of their home. We must, therefore, gauge the description contained in the warrant to determine whether it was "such that the officer with a search warrant [could] with reasonable effort [have ascertained and identified] the place intended." *Steele v. United States,* 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed.2d 757 (1925).

The building in which the search took place is located at the intersection of McClelland Drive and Byron Street. It can be entered from either street. The portion

facing McClelland Drive bears municipal addresses 4765, 4767 and 4769 McClelland Drive. There are three commercial establishments in this part of the structure: a beauty salon, a barber shop and an ice cream store. The residence of John Haydel, Sr. shares. a common wall with that structure, but has an entrance that faces Byron Street, and bears the address 5466 Byron Street.[5] The residence and the stores are parts of an integrated structure. The home can be entered by passage through either the ice cream store or barber shop and opening an unmarked interior doorway located in a storage area at the rear of the ice cream store.[6]

The agents searched, and the gambling records were found, in the Haydel residence. Therefore, we must determine whether the warrant sufficiently described that residence. The face of the warrant, while somewhat ambiguous, fairly points to the Haydel residence as the target of the search.[7] Its description of the premises to be searched concludes with the statement that "the residence" has an "entrance through the barber shop."[8] The warrant,

question. It is evident, therefore, that *Salvucci* does not support the proposition that a child lacks an expectation of privacy in his parents' home.

5. The McClelland Street portion of the structure also contains a second floor apartment, the main entrance of which is reached from an exterior staircase located on Byron Street.

6. The floor plan of the structure is shown on the sketch attached as an appendix. The structure was built in stages and eventually served as both a residence and place of business for the Haydel family. When the Haydel family first moved to Baton Rouge, they constructed part of the McClelland Street portion, including the barber shop and the beauty salon. The barber shop was owned and operated by the defendant's father. Seven years after that portion of the structure was completed, the residential portion, facing Byron Street, was built. Five years later, the ice cream store was added to the McClelland Street structure. The defendant and his parents occupied the residence until the defendant moved to the apartment located above the McClelland Street portion. His parents have continued to live in the residential portion since then. The building was apparently designed as it was to permit easy

access from the Haydel family businesses to their residence.

Until 1976, John Haydel, Jr., the defendant, operated the ice cream store, with occasional assistance from his mother. In fact, he was apparently known by the nickname of "Ice Cream." His motion to strike the alias from the indictment was denied by the district court because government witnesses were expected to refer to him by that name.

7. A picture of the building to be searched was attached to the warrant. That picture is inconclusive and adds nothing to the clarity of the warrant. The picture includes the portion facing McClelland Street and the Byron Street side of the commercial portion. The view of the front of the residence, however, is obstructed by a truck parked in the field of view. The *only section of the residence visible in the picture is the roof.*

8. The entire description of the premises to be searched included on the face of the warrant, reads as follows:

4765 McClelland Drive, Baton Rouge, Louisiana, being a two story building located on the southwest corner of McClelland Drive and Byron Street, the second floor of which is

however, is far from a model of clarity and is not dispositive of Haydel's claim. To clarify this ambiguity, we may, under some circumstances, examine the affidavit submitted to support issuance of the warrant.

If an objective reading of the description contained on the face of the warrant did not fairly direct attention to the place actually searched, we would be compelled to hold the search illegal without further discussion. An insufficient warrant cannot be cured by the most detailed affidavit. If, as is the case here, the warrant is ambiguous, but fairly directs attention to the place actually searched, and if the affidavit supporting the warrant is attached to the warrant when issued, the affidavit may be considered to clarify an ambiguity on the face of the warrant. *See generally* W. R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 4.5(a) (1978). The affidavit must be attached to the warrant so that the executing officer and the person whose premises are to be searched both have the information contained in the affidavit, in addition to what is said on the face of the warrant.

We consider the affidavit here for several reasons. First, the affidavit appears in the record with the warrant each time the warrant itself appears. While there is nothing in the testimony to show that it was actually attached to the warrant that was executed, testimony concerning how the search was made demonstrates that the officers knew that they were looking for the Haydel residence.[9] Presumably, had Haydel asked to see the warrant to ascertain the officers' authority, he would have been shown the

warrant and the affidavit together. Because the burden of proof in a motion to suppress in on the petitioner, *United States v. Various Gambling Devices*, 478 F.2d 1194, 1199 (5th Cir. 1973), we certainly should not assume the contrary. Therefore, we may consider the information contained in the affidavit to elucidate the warrant.

The affidavit recounted numerous instances of Haydel and his associates entering the building through the McClelland Street entrance. Testimony at the suppression hearing also revealed that the Haydel family and their guests routinely entered the residence through the commercial establishments and the interior door. Moreover, the affidavit contains information from two confidential informants that the targets of the gambling investigation met weekly at "the residence of John Haydel, Sr. at 4765 McClelland Drive ... to balance their gambling records...."

A warrant's description of the place to be searched need not meet technical requirements nor have the specificity sought by conveyancers. It need only describe the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority. When the search warrant is read in conjunction with the affidavit, it is clear that the target of the search was the *residence* of John Haydel, Sr. There was no danger that the less-than-perfect description on the face of the warrant allowed the officers to conduct a random search. When the warrant is read in circumstances' light, the object of the search authorized was clear.[10]

___

white and the lower floor being brick and having two businesses, The Dixie Maid Ice Cream Store, 4769 McClelland Drive and the Brookstown Barber Shop, 4767 McClelland Drive *adjoining on the east side of the residence, and have entrance through the Barber Shop.* (Emphasis supplied)

**9.** The agents entered through the ice cream store and, after asking for Mr. and Mrs. Hay-

del, were led by the storekeeper directly to the interior door of the Haydel residence.

**10.** *See also United States v. Campanile*, 516 F.2d 288 (3d Cir. 1975). *Compare United States v. Higgins*, 428 F.2d 232 (7th Cir. 1970) (warrant failed to describe the particular subunit of a multiple-occupancy structure).

Therefore, the search was not undertaken illegally and did not contravene the requisites of the fourth amendment.

### III.

■ Haydel next contends that the gambling records were seized in violation of the self-incrimination clause of the fifth amendment. Citing the seminal decision of *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), he argues that, because the wagering tax statute compels gamblers to maintain certain records under threat of statutory penalty, the seizure and subsequent introduction of these records violate the fifth amendment's guarantee against compulsory self-incrimination.

The Court in *Andresen* held that seizure of a person's papers did not violate the fifth amendment because the government's taking of pieces of paper did not compel their owner to incriminate himself.[11] It drew a distinction between papers secured by means of a subpoena, which requires the individual to supply the incriminating information, and a search, where the government takes the initiative, and asks nothing of the owner, save to stand aside while it seizes a physical object. In drawing this distinction, however, the Court seemed to stress the fact that Andresen had voluntarily committed his thoughts to paper. Haydel, therefore, seeks to rely upon intimations drawn from this mode of explaining the *Andresen* decision, by emphasizing that he did nothing voluntarily. He was required by statute both to file wagering returns and reports and to maintain certain records necessary to prepare the reports. 26 U.S.C. §§ 4403, 4412 and 6001.

If Haydel had been charged with violating a gambling statute instead of the wagering tax law, the issue would be whether the statutory requirement that he file wager returns compelled him to record information that incriminated him for another crime. He was, however, charged only with the tax offense. The statute requires him to keep records and provides that the "books of account of any person liable for tax . . . may be examined and inspected as frequently as necessary" to aid in the enforcement of the tax on wagering. 26 U.S.C. § 4423. What was seized was no more than what the law required Haydel to maintain. Therefore, his claim is, at bottom, that the requirements of Section 4423 contravene the fifth amendment.

When the question is directly considered, the answer is quickly found. The Supreme Court in 1968 held unconstitutional, against a fifth amendment challenge, the predecessor to the current tax on wagering. *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); *Marchetti v. United States*, 390 U.S. 39, 45, 88 S.Ct. 697, 701, 19 L.Ed.2d 889 (1968). In reaching that conclusion, the Court emphasized that the information contained in the returns and reports filed by the gambler under the wagering statute was routinely made available to law enforcement officials for use in prosecuting violations of anti-gambling statutes. The Court concluded, therefore, that the record keeping and reporting requirements of the act constituted compulsory self-incrimination in violation of the fifth amendment. The government's power to tax illegal activities, however, was explicitly approved. *Id.* at 44, 88 S.Ct. at 700, 19 L.Ed.2d at 895. *See also License Tax Cases*, 72 U.S. (5 Wall.) 462, 18 L.Ed. 497 (1866).

In response to these decisions, Congress amended the statute to prohibit disclosure of any information derived from wagering tax returns except to enforce the provisions of the wagering tax statutes. 26 U.S.C.

---

11. *See generally* The Supreme Court, 1975 Term, 90 Harv.L.Rev. 56, 76–78 (1976); Note, Formalism Legal Realism and Constitutionality

Protected Privacy Under the Fourth and Fifth Amendments, 90 Harv.L.Rev. 945 (1976).

§ 4424.[12] Moreover, the statute forbids the use of information derived from the returns or records in any criminal proceeding "except in connection with the administration or civil or criminal enforcement of" the wagering tax statutes. 26 U.S.C. § 4424(c). We have held that the registration and filing requirements of the statute, thus limited, are constitutional and that gamblers, such as Haydel, are not privileged to refrain from filing the necessary documents. *United States v. Jeffers*, 621 F.2d 221 (5th Cir. 1980). *See also United States v. Stavros*, 597 F.2d 108 (7th Cir. 1979); *United States v. Sahadi*, 555 F.2d 23 (2d Cir. 1977); *United States v. O'Brien*, 420 F.Supp. 834 (D.Conn.), *aff'd* 555 F.2d 136 (2d Cir. 1976).

▇▇▇ It would, of course, be impracticable, if not impossible, to tax wagering income without requiring the returns. Filing false returns can later incriminate the gambler-taxpayer, but filing false income tax returns also incriminates an income taxpayer, and the requirement that taxpayers keep records does not contravene the fifth amendment.[13] *See, e. g., United States v. Edelson*, 604 F.2d 232 (3d Cir. 1979). Therefore, accepting the premises that the government has the power to tax wagering income and that the current statutes does

not violate the fifth amendment by requiring returns in the first instance, we hold that the records are not, as urged by Haydel, absolutely immune from seizure, and that they could be validly introduced in a prosecution for falsely filing those returns.[14] They were, therefore, not improperly admitted by the district court.[15]

## IV.

▇▇▇▇ Haydel's fallback proposition is that the records were inadmissible in the tax trial because the only suspected offenses listed in the warrant were gambling, not tax, related. This contention is meritless. Use of the fruits of a search supported by a valid warrant is not confined to the offense giving probable cause. Evidence seized pursuant to a warrant issued for one offense may be used at a trial for another crime. *See, e. g., United States v. Hanon*, 428 F.2d 101 (8th Cir. 1970), *United States v. Scaglione*, 446 F.2d 182 (5th Cir. 1971), *United States v. Kane*, 450 F.2d 77 (5th Cir. 1971). If probable cause exists and a warrant is secured, the constitution does not limit the uses of relevant evidence.

Accordingly, the convictions are AFFIRMED.

---

12. *See* H.R.Rep.No. 1401, 93d Cong., 2d Sess. 5–6 (Conf.Com.), *reprinted* in [1974] U.S.Code Cong. & Ad.News 6228, 6232, 6233. *See also* Blakely & Kurland, Development of the Federal Law of Gambling, 83 Cornell L.Rev. 923, 994–1010 (1978).

13. There can, of course, be valid claims of privilege to refuse to answer questions on a tax return. Properly to claim this privilege, a taxpayer must have a real basis to fear that his answers would subject him to criminal prosecution. *See United States v. Sullivan*, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927). Once a return is filed without claiming the fifth amendment privilege, however, the taxpayer may not later claim that the information contained in the return was compelled. *Garner v. United States*, 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976).

Haydel did not claim a privilege when he registered or at the time he filed the returns. *Cf. Garner v. United States*, 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976).

14. The statute provides that the records may be "examined and inspected." 26 U.S.C. § 4423. It does not specify, however, the manner in which this inspection is to occur. Our holding is limited to the situation in which the records were obtained by means of a warrant rather than in some other fashion.

15. We intimate no opinion concerning whether a gambler would be unable to claim his privilege against compulsory self-incrimination if the information "compelled" by the gambling tax return were introduced in a criminal prosecution for illegal gambling. *See Garner v. United States*, 424 U.S. 648, 660 n.14, 96 S.Ct. 1178, 1185 n.14, 47 L.Ed.2d 370, 381 n.14 (1976). *Cf. Andresen v. Maryland*, 427 U.S. 463, 474–75, 96 S.Ct. 2737, 2745, 49 L.Ed.2d 627 (1976) (the Court noted that a result contrary to the one reached "would bar the admission of an accused's gambling records in a prosecution for gambling"). Here, as we have mentioned, the district court upheld Haydel's fifth amendment challenge with respect to the gambling counts of the indictment and the issue is not before us.