26 P.3d 1008 (2001)
107 Wash.App. 247
STATE of Washington, Respondent/Cross-Appellant,
v.
Marvin J. FRANCISCO, Appellant/Cross-Respondent.
No. 44464-6-I.
Court of Appeals of Washington, Division 1.
July 16, 2001.
*1009 Catherine Glinski, James Dixon, Nielsen Broman & Associates, Seattle, for Appellant.
Brian Martin McDonald, Deputy Pros., Ann Marie Summers, King County Prosecutors Office, Seattle, for Respondent.

PUBLISHED IN PART
BECKER, A.C.J.
Marvin Francisco's appeal from a murder conviction arises from a 1997 shooting on the West Seattle Bridge. Police found the gun used in the shooting in a search of Francisco's mother's home. Francisco contended the search was illegal, and assigns error to the court's denial of his motion to suppress. But in order to challenge the fruits of a search, a person charged with a non-possessory crime must have a legitimate expectation of privacy in the place searched or items found. Francisco had no legitimate expectation of privacy in his mother's home, his occasional use of it was not tantamount to residence, and he was neither a current guest nor physically present at the time of the search. Therefore, the search even if illegaldid not violate Francisco's Fourth Amendment rights.[1]
*1010 On the evening of September 16, 1997 five friends, two young men and three young women, were celebrating a birthday. At about 1:30 in the morning, they were in a black Honda heading west on the West Seattle Bridge when the car struck a barrier and two tires went flat. While they waited for help to arrive, the two men stood in front of the car and the women remained in the car. A red sports car arrived on the scene and pulled up next to the Honda. A passenger got out of the red car and began shooting at the two men with a rifle. He then turned to the car and continued to fire at the three female passengers. The shooter fired 73 rounds of ammunition at the group before fleeing the scene. The two men were dead by the time an ambulance arrived. The three women were all injured, but survived.
At trial the State's principal witness was Emerson Yamul, who pled guilty to one count of murder in exchange for his testimony. He testified that he drove Marvin Francisco, his sister's boyfriend, to the bridge that night. He said that Francisco directed him to pull up next to a black car pulled over on the side of the bridge and then Francisco did the shooting. He said that Francisco thought the victims were some other people who had shot at Francisco and some of his friends a couple of weeks earlier. Yamul said that after the shooting, he drove Francisco to the Georgetown neighborhood where Francisco hid the gun in the bushes. Then they went to a casino along with some other friends. The next day, Yamul helped Francisco to disguise the red car by removing a tail fin and some distinctive stickers with Asian writing. Yamul said that Francisco went back and picked up the gun the next day. Several of Francisco's other friends testified that Francisco admitted to the shooting immediately after the event. Their versions of the events before and after the shooting corroborated Yamul's account.
Francisco testified in the defense case. He said it was his friend Kyle Gojio who had been with Yamul that night on the West Seattle Bridge. He said he found out afterwards about their involvement in the shooting, and as the leader of their group he "took control of everything" by disguising the car and hiding the murder weapon.
The jury convicted Francisco on two counts of aggravated first degree murder and three counts of attempted first degree murder. He was sentenced to life in prison without parole.

SUPPRESSION OF MURDER WEAPON
Before trial, Francisco moved to suppress testimony that police had found the murder weapon, along with another gun, in a closet at his mother's house. In the suppression hearing, police officers testified that they began surveillance on Francisco's apartment two weeks after the murder, following a tip that a car at that location matched the description of the car used in the shooting. The police followed Francisco and a friend as they drove the car from the apartment to Francisco's mother's house. When they arrived at the house, the police arrested them. One of the officers testified that he spoke with Francisco's mother after the arrest. She signed a consent to search form. The officer searched the storage shed in the back yard and the crawlspace under the house, but not the inside of the house.
Later that night, the police arrested Kyle Gojio, who eventually told them that the gun used in the shooting was in the front closet of Francisco's mother's home. At about 2 a.m. the police returned to the mother's house and again obtained her written consent to search. When they searched the closet they found two guns, one of which was a Mack 90 sporter rifle used in the shooting.
To support his motion to suppress, Francisco argued that the consent form his mother signed was invalid because the officers failed to inform her, before beginning their search, that she could revoke or limit the scope of her consent. The court denied Francisco's motion to suppress, ruling that Francisco "did not reside with her and cannot assert a privacy interest solely because she is his mother." Francisco appeals from this ruling.
Constitutional privacy rights are personal rights that cannot be vicariously asserted. State v. Foulkes, 63 Wash.App. 643, 647, *1011 821 P.2d 77 (1991). Whether a particular defendant is entitled to seek the remedy of exclusion for evidence obtained by an illegal search or seizure is sometimes characterized as whether the party has "standing" to qualify for Fourth Amendment protection. See, e.g., State v. Jackson, 82 Wash.App. 594, 601-02, 918 P.2d 945 (1996). But "the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment" rather than on any theoretically separate, but invariably intertwined, concept of standing. Rakas v. Illinois, 439 U.S. 128, 139, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).
Rakas, the leading federal case on this issue, rejected the argument that any defendant at whom a search was "directed" could contest the legality of the search on that basis. See Rakas, 439 U.S. at 132-140, 99 S.Ct. 421, discussing Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). On the other hand, the Rakas court did not adopt a bright line rule requiring the defendant to have an ownership interest in the place searched in order to challenge the legality of a search. The capacity to claim the protection of the Fourth Amendment "depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Rakas, 439 U.S. at 143, 99 S.Ct. 421.
Francisco argues he had the capacity to claim the protection of the Fourth Amendment in his mother's home. But the fact that the house belonged to his mother was not, in itself, enough to make that home a Fourth Amendment sanctuary for an adult child not living there. See State v. Putman, 61 Wash.App. 450, 456, 810 P.2d 977 (1991) (defendant not allowed to challenge the basis of a search warrant used to search his father's property for the murder weapon). Nevertheless, it is clear that "a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." Rakas, 439 U.S. at 142, 99 S.Ct. 421. Property ownership is merely one factor to be considered. United States v. Salvucci, 448 U.S. 83, 91, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).
Persons may challenge searches of the premises they occupy even though they are not parties to the legal arrangements concerning the possessory interest. See Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (grandson had standing to challenge a search of his grandmother's home during his absence because he regularly resided there as well). Even part-time or temporary residence may create a legitimate expectation of privacy. See State v. Cleveland, 118 Wis.2d 615, 348 N.W.2d 512 (1984), overruled on other grounds by State v. Stevens, 181 Wis.2d 410, 511 N.W.2d 591 (1994) (defendant could challenge a police no-knock entry in execution of a warrant when the defendant was visiting the state and temporarily residing in his mother's cabin at the time of the search); Martin v. United States, 567 A.2d 896 (D.C. 1989) (defendant could challenge his warrantless arrest in his grandparents' home because he lived there most of the time); Commonwealth v. Wagner, 486 Pa. 548, 406 A.2d 1026 (1979) (defendant could challenge his warrantless arrest in his fiancee's home, based on findings that the defendant spent nights and weekends there; others thought he lived there; and his use of the home was the same as the use of a residence). But here, the testimony supports the trial court's conclusion that Francisco lived with his girlfriend at her Tukwila apartment, and that he did not occupy or reside at his mother's house even on a part-time or temporary basis.
Francisco contends, however, that he had a legitimate expectation of privacy in his mother's residence created by the familial nature of his relationship with her as well as the fact that he was a welcome visitor in her home, occasionally staying there overnight. Francisco primarily relies on United States v. Haydel, 649 F.2d 1152 (1981). Haydel held that the defendant, a bookmaker, could challenge the search warrant although he "did not reside regularly" at his parents' home where the search occurred. Haydel, 649 F.2d at 1155. Haydel had a key to the home, kept clothing there, occasionally stayed over-night, *1012 and conducted a "significant portion of his gambling activities at the home". Haydel, 649 F.2d at 1155. Significantly, he also claimed ownership of the gambling records that were found in a cardboard box under the bed of Haydel's parents. "Although the district court did not explicitly so hold, it is reasonable to assume that Haydel had the authority to exclude persons other than his parents and their guests from the home. Finally, it is clear from his actions that Haydel exhibited a subjective expectation that the contents of the box stowed under his parents' bed were to remain private." Haydel, 649 F.2d at 1155.
Unlike Haydel, Francisco's intermittent use of his mother's house as a place to stay overnight, do laundry, and store clothes does not suggest that he had authority to exclude anyone from the premises or that he could legitimately expect that items he left there would remain undisturbed. His mother testified that she did not know the guns were in her closet, and that she did not allow guns in her home. And unlike the defendant in Haydel, Francisco did not claim to be the owner of the gun, so he cannot claim an expectation of privacy arising from a possessory interest.
In addition to his reliance on the familial relationship, Francisco also claims that his status as an occasional guest in his mother's home allows him to challenge the legality of the search. Courts have permitted guests to challenge searches and seizures in the home of a host. In such cases, the fact that the guest does not have the authority to exclude others from the premises is not a consideration. In Minnesota v. Olson, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), Olson was an overnight guest at his girlfriend's residence when the police made a warrantless entry to arrest him. The United States Supreme Court found that Olson had a legitimate privacy interest in the area searched and could therefore challenge the alleged Fourth Amendment violation. The Court relied on the "longstanding social custom" of staying overnight in another's home that "serves functions recognized as valuable by society." Olson, 495 U.S. at 98, 110 S.Ct. 1684. But Olson and the other guest cases cited by Francisco differ from the case at hand in that, in each case, the defendant was a current guest and was physically present at the time of the search. See, e.g. State v. Rodriguez, 65 Wash.App. 409, 828 P.2d 636 (1992); Rose v. United States, 629 A.2d 526 (D.C.1993). Francisco was not a guest in his mother's house at the time of the challenged search, nor was he physically present. One court has concluded that a current guest had standing to challenge a seizure of his personal effects from the home of a host when the guest was not physically present at the time of the seizure. Commonwealth v. White, 459 Pa. 84, 327 A.2d 40 (1974). But unlike this case, the defendant claimed ownership of the items seized.
In summary, from the evidence presented, the trial court correctly concluded that Francisco's challenge to the search and seizure of the guns lacked the necessary threshold showing of his legitimate expectation of privacy in the premises.

JURY VIEW
The court granted the State's motion to allow the jury to view the bullet-ridden Honda. Francisco claims that this ruling forced him to waive his right to be present during presentation of evidence in order to avoid having the jury view him in restraints.
A criminal defendant has a guarantee by the constitutional confrontation clause and due process clause to be present at every critical stage of his trial. State v. Berrysmith, 87 Wash.App. 268, 273, 944 P.2d 397 (1997). However, a defendant does not have a constitutional right to be present at a jury view. State v. Perkins, 32 Wash.2d 810, 861, 204 P.2d 207 (1949). A jury view is not a part of the trial and has no evidentiary value. Perkins, 32 Wash.2d at 864, 204 P.2d 207; State v. Much, 156 Wash. 403, 413-14, 287 P. 57 (1930). Here, the jury view preceded the testimony of a forensic scientist specializing in firearms. No one was permitted to speak during the view. The judge and both counsel were present. The judge instructed the jury that the car was not evidence and that the purpose of the view was to assist the jury in understanding the evidence.
*1013 Francisco contends the viewing of the Honda was a means of introducing a piece of evidence too large to bring into the courtroom, and was in that respect inherently a part of the trial. We disagree. The jury was instructed that the view was not evidence. It was a silent viewing. There was no testimony or argument to which the defendant could have objected had he been present.
The decision of whether or not to allow a jury view is within the discretion of the trial court. State v. Land, 121 Wash.2d 494, 501-02, 851 P.2d 678 (1993). While Francisco may have been faced with a difficult tactical choice in deciding whether to attend, it was not a decision that affected his constitutional rights and he has failed to show that the court abused its discretion.
We affirm.
The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.
ELLINGTON, J., and APPELWICK, J., concur.
NOTES
[1] Our holding in this case does not bear on the question whether the automatic standing doctrine applies in Washington when a person is charged with a possessory crime. See, e.g., State v. Williams, 142 Wash.2d 17, 20-22, 11 P.3d 714 (2000).