NOT DESIGNATED FOR PUBLICATION

No. 116,981

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

BRANDON ALVIN DANNEBOHM,
*Appellee*.


MEMORANDUM OPINION

Appeal from Barton District Court; RON SVATY, judge. Opinion filed August 11, 2017. Reversed and remanded.

*Douglas A. Matthews*, assistant county attorney, *Amy J. Mellor*, county attorney, and *Derek Schmidt*, attorney general, for appellant.

*Donald E. Anderson II*, of Anderson, Bristow, & Anderson Law Office, of Ellinwood, for appellee.


Before ARNOLD-BURGER, C.J., LEBEN, J., and BURGESS, S.J.


*Per Curiam*:  On June 23, 2015, police searched the apartment of Alexis Tracy and found a safe belonging to Brandon Alvin Dannebohm. Police found methamphetamine inside the safe, and the State charged Dannebohm with possession with intent to distribute methamphetamine and no drug tax stamp. Dannebohm filed a motion to suppress, arguing the police had exceeded the scope of Tracy's consent when they searched her apartment. The State filed a motion to dismiss, arguing Dannebohm did not have standing to challenge the search. The district court originally agreed with the State

1

and dismissed the motion. On a motion to reconsider, however, the district court reversed its earlier ruling and granted Dannebohm's motion to suppress. The State appeals, arguing Dannebohm does not have standing and police did not exceed the scope of Tracy's consent. Finding that Dannebohm did not have standing, we reverse and remand this matter.

FACTUAL AND PROCEDURAL BACKGROUND

On July 2, 2015, the State charged Dannebohm with one count of possession with intent to distribute heroin or methamphetamine, a severity level 1 drug felony, in violation of K.S.A. 2015 Supp. 21-5705(a)(1) and (d)(3)(D), and one count of no drug tax stamp, a level 10 nonperson felony, in violation of K.S.A. 79-5204. Dannebohm filed a motion to suppress challenging the search which uncovered the methamphetamine that formed the basis of his charges.

On June 23, 2015, Tracy was living in apartment in Barton County. According to Tracy, Dannebohm had been a close friend of hers for a long time and was like a brother to her. Dannebohm spent a lot of time at Tracy's apartment, having helped her through a recent pregnancy. During her pregnancy, Dannebohm would check on her once a day. Dannebohm was a welcome guest and would sometimes be at Tracy's apartment when she was not there. To Tracy's knowledge Dannebohm did not have a key to her apartment, and she usually locked her apartment when she left.

Tracy was the only person on her lease, and only she and her son lived at her apartment. Tracy's property manager verified that Dannebohm was not on the lease, and he did not stay at Tracy's apartment on a regular basis to the best of her knowledge. Dannebohm did not pay rent or any of the bills while Tracy was living there. Dannebohm did keep some belongings, such as clothes, at Tracy's apartment. Tracy did not believe Dannebohm had ever used her apartment address as his home address.

2

Dannebohm also kept a safe at her apartment. He had brought the safe to her apartment sometime after June 9, 2015. Tracy used the safe as a TV stand but did not keep any of her personal property inside it. Tracy was "pretty sure the PIN was written down somewhere, but [she] never really got into it." However, Dannebohm sometimes left the safe open.

On June 23, 2015, Dannebohm was living north of Great Bend. A records clerk for the Barton County Sheriff's Office verified that Dannebohm had never listed Tracy's address as his home address during the summer of 2015 when he was booked into jail. Dannebohm said he regularly stopped by Tracy's apartment to check on her during her pregnancy. Sometimes Dannebohm did not go in, and Tracy would just come out to his car. Dannebohm did not recall ever spending the night, though he thought he may have fallen asleep on her couch a few times for a few hours. Dannebohm had also kept some clothes at Tracy's apartment.

On June 23, 2015, Tracy was leaving for an appointment when Dannebohm arrived at her apartment carrying a blue cooler. Tracy told Dannebohm she would be back in a bit. Tracy did not look inside the cooler at that time.

While Tracy was out, someone called to tell her the police had been knocking on her apartment door. Tracy called the police to tell them she would be home shortly. After arriving home, Tracy spoke with Officer Chance Bailey and gave him consent to search her apartment for Dannebohm. Tracy told police anything in the safe belonged to Dannebohm. Tracy stated, however, that she only gave consent to search for Dannebohm, not to search her apartment.

Just before entering Tracy's apartment, Officer Adam Hales, the K-9 officer, asked again if Tracy consented to a search, and she said, "Yeah, that's fine." Tracy testified that

3

no one asked her consent to take the dog into the apartment. During the search, the officers kept Tracy outside.

Officer Jacob Harlow testified that on June 23, 2015, Barton County had an active warrant out for Dannebohm's arrest. Officer Harlow received information that Dannebohm might have been at Tracy's apartment. Officer Harlow eventually made contact with Tracy while she was on her way home. Tracy told Officer Harlow that Dannebohm had been at her apartment earlier that day but she did not believe he was still there.

After Tracy returned to her apartment, she allowed Officers Harlow and Hales into her apartment to search for Dannebohm. Officer Harlow testified that he also asked for consent to search Tracy's apartment for Dannebohm and that she had consented. The officer did not ask to search her apartment for any other reason. Officer Harlow testified Tracy had told police Dannebohm brought the methamphetamine into her apartment in a blue cooler.

According to Officer Harlow, Officer Hales took his K-9 because the police had information that there might be drugs in a safe inside the apartment. The officers did not find Dannebohm, but Officer Harlow saw a duffel bag with men's clothing. The officers found a glass pipe with burnt, white residue sitting in plain view on top of the bed and a safe which Tracy had said belonged to Dannebohm. After the search, Officer Hales advised Officer Harlow that his K-9 had indicated the presence of a controlled substance in the safe. Officer Harlow seized the safe and the pipe.

After taking the pipe and the safe to the Ellinwood Police Department, Officer Harlow applied for a search warrant to open the safe. The district court granted the warrant, and Officer Harlow obtained the combination for the safe's lock from another officer who had worked on a prior case involving the same safe. Inside the safe, Officer

4

Harlow found a copy of an arrest warrant and bonding information for Dannebohm as well as a large quantity of what Officer Harlow believed was methamphetamine. Kansas Bureau of Investigation tested the substance and confirmed it was 447.5 grams of methamphetamine.

Officer Hales testified that he brought his K-9 for officer safety because they had received information that Dannebohm may have a firearm. According to Officer Hales, Tracy told them that Dannebohm had brought a safe over and that there was "stuff" in it. When asked if "stuff" meant drugs, Tracy said yes. Tracy then told Officer Hales that his K-9 would hit on the safe. Tracy testified she never told Officer Hales she did not want the K-9 to go into her apartment. Officer Hales stated that Tracy did not consent to the K-9 sniffing her apartment for drugs and that he did not have a warrant to search the apartment for drugs.

Officer Hales explained that his K-9 behaves differently based on the commands he gives him. On the initial search of the apartment, Officer Hales had only commanded his K-9 to search for a suspect. After they finished clearing the apartment and determined there were no threats, Officer Hales and his K-9 were in the master bedroom. Based on what Tracy had said about the safe, and the pipe sitting on the bed in plain view, he commanded his K-9 to search for controlled substances. The K-9 indicated on the bed near the pipe and on the safe.

Dannebohm claims multiple times that Hales moved the safe before his K-9 indicated on it. Presumably, he gleaned this information from Officer Hales' body microphone recording. However, this recording was not included in the record on appeal.

Officer Bailey told Tracy the officers wanted to search her apartment for Dannebohm, and Tracy gave consent. Before the search, Tracy told the officer that Dannebohm had brought a blue cooler to her apartment with "stuff" in it. The officer

5

asked if "stuff" meant drugs, and Tracy nodded her head yes. Tracy told Officer Bailey that Dannebohm placed the drugs in the safe and Officer Hales' K-9 would be able to smell it. After this conversation, Officer Bailey again confirmed with Tracy that the officers could search her apartment. Tracy agreed and again said that the K-9 would be able to smell what was in the safe. This indicated to Officer Bailey that Tracy consented to have the K-9 search for drugs in her apartment.

On October 4, 2016, Dannebohm filed a motion to suppress pursuant to K.S.A. 22-3216. Dannebohm argued police had exceeded the scope of Tracy's consent in conducting the search of her apartment. The officers then used evidence uncovered in that search in their probable cause affidavit to obtain a written search warrant to open the safe seized from Tracy's apartment.

On October 18, 2016, the State filed a motion to dismiss Dannebohm's motion to suppress. The State argued Dannebohm did not have standing to challenge the search. According to the State, Dannebohm was neither a tenant nor a guest at the time of the search; therefore, he did not have a reasonable expectation of privacy. The district court held a motion hearing on October 25, 2016, and granted the State's motion to dismiss, noting that "the issue is whether the person's there or not." The district court later filed a written journal entry granting the State's motion to dismiss.

On November 8, 2016, Dannebohm filed a motion to reconsider. The district court held a hearing on Dannebohm's motion to reconsider on November 30, 2016. The district court reversed its previous finding and granted Dannebohm's motion to suppress. The district court held that Dannebohm was a guest and had exhibited an expectation of privacy by leaving a safe at Tracy's apartment. The district court noted that caselaw did not support its previous distinction regarding whether Dannebohm was physically present at the time of the search. The district court also found the K-9 sniff was illegal and could

6

not support a valid search warrant. On December 9, 2016, the district court filed a written journal entry granting Dannebohm's motion. The State appeals.

## DID THE DISTRICT COURT ERR IN FINDING DANNEBOHM HAD STANDING TO PURSUE A MOTION TO SUPPRESS?

On appeal, the State argues the district court erred in finding Dannebohm had standing to pursue a motion to suppress. The State contends Dannebohm's expectation of privacy did not extend to Tracy's apartment because he did not live there, he was not an overnight guest, and he was not there at the time of the search. Dannebohm counters he had a legitimate expectation of privacy in Tracy's apartment because he was a regular, welcome guest and he had made efforts to maintain his privacy.

An appellate court applies a bifurcated standard of review when reviewing a district court's decision on a motion to suppress. The district court's factual findings are reviewed to determine whether they are supported by substantial competent evidence. This court reviews the ultimate legal conclusion using a de novo standard. In reviewing the factual findings, this court does not reweigh the evidence or assess the credibility of witnesses. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016).

In order to have standing to seek suppression of evidence, a defendant must have a legitimate expectation of privacy in the place searched. *State v. Talkington*, 301 Kan. 453, 476, 345 P.3d 258 (2015). Fourth Amendment rights under the United States Constitution are personal, and they may not be vicariously asserted by a third party. 301 Kan. at 476. Thus, Dannebohm cannot rely on Tracy's expectation of privacy in her home but, rather, must demonstrate that he personally had a subjective expectation of privacy in her apartment and that the expectation was objectively reasonable. 301 Kan. 477. The defendant bears the burden to prove standing. Once the defendant establishes he or she

has standing, the State carries the burden to prove that a search and seizure was lawful. 301 Kan. 476; see *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016).

A person who lacks "'an ownership or possessory interest in the property searched has little legitimate expectation of privacy in that property.' [Citation omitted.]" *State v. Cox*, 51 Kan. App. 2d 596, 599, 352 P.3d 580 (2015). Despite a lack of ownership, however, social guests such as Dannebohm may still have an expectation of privacy in their host's home depending on where they fall on a spectrum. On one end of that spectrum are those merely "'legitimately on the premises,'" which is generally not enough to afford protection under the Fourth Amendment. *Minnesota v. Carter*, 525 U.S. 83, 91, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998); see *Rakas v. Illinois*, 439 U.S. 128, 142, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). On the other end are overnight guests, whose status as such "is alone enough to show that [one] ha[s] an expectation of privacy in the [host's] home that society is prepared to recognize as reasonable." *Minnesota v. Olson*, 495 U.S. 91, 96-97, 110 S. Ct. 1684, 1688, 109 L. Ed. 2d 85 (1990). Then there are those, such as Dannebohm, who fall somewhere in between.

Courts have looked to various factors to determine if a social guest who does not stay overnight has a legitimate expectation of privacy in his or her host's home. In *Carter*, the United States Supreme Court found the Fourth Amendment did not protect a social guest because (1) the nature of the guest's visit was purely commercial, (2) the guest was only at the host's home a short time before the search, and (3) the guest did not have any previous connection with the host. 525 U.S. at 90-91. The Tenth Circuit has recognized that "even social guests who do not stay the night have a reasonable expectation of privacy in the host's home and may therefore challenge a search of the home on Fourth Amendment grounds." *United States v. Thomas*, 372 F.3d 1173, 1176 (10th Cir. 2004). In order to have a reasonable expectation of privacy, the Tenth Circuit has held that a social guest must demonstrate a "'degree of acceptance into the household'" and an "'ongoing

8

and meaningful connection to [the host's] home.' [Citation omitted.]" *United States v. Poe*, 556 F.3d 1113, 1122 (10th Cir. 2009).

The Kansas Supreme Court has similarly recognized that social guests who do not spend the night may still receive protection under the Fourth Amendment. For example, in *State v. Huff*, 278 Kan. 214, 92 P.3d 604 (2004), officers responded to a noise complaint and entered the host's apartment without the host's consent. A number of people were inside the apartment, including the defendant. The defendant was allowed to leave the apartment, but a search of the apartment uncovered contraband belonging to the defendant, and he was arrested. The court held that the defendant had standing to challenge the search because he was a social guest. 278 Kan. at 220.

More pertinent to the case at hand is *Talkington*. In that case, the Kansas Supreme Court specifically addressed whether a social guest has a reasonable expectation of privacy in the curtilage of a host's home. Before reaching this issue, the court first determined whether the defendant had an expectation of privacy in the host's home. In analyzing this question, the court looked to both *Carter* and Tenth Circuit precedent. The court determined that the defendant did have an expectation of privacy in his host's home because: (1) the defendant's visit was not commercial in nature; (2) the defendant had been at his host's home for a few hours before the officers arrived; (3) the defendant and his host had been friends for 7 or 8 years; (4) the defendant and host worked on cars and mopeds together; and (5) the defendant visited whenever he was in town, including the previous week. *Talkington*, 301 Kan. at 479-80.

Similar to the defendant in *Talkington*, Dannebohm had been friends with Tracy for several years. Dannebohm regularly visited Tracy at her apartment, and he had been at her apartment earlier on the same day as the search. The purpose of Dannebohm's visits were not commercial in nature but, rather, to check on Tracy's welfare. Dannebohm

9

also kept some personal items at Tracy's home, including a safe and a duffel bag full of clothes.

A notable difference between Dannebohm's case and *Talkington*, though, is that Dannebohm was not at Tracy's home at the time of the search. The State argues this is a critical difference between this case and other cases which have recognized a guest's privacy interests in his or her host's home. Dannebohm's presence at the time of the search is relevant to determining if he was a current guest at the time.

Other jurisdictions have refused to recognize the privacy interest of a defendant who had previously been a guest in the host's home but was not a current guest at the time of the search. See, *e.g.*, *State v. Francisco*, 107 Wash. App. 247, 254-55, 26 P.3d 1008 (2001) (discussing relevance of whether a defendant is a current guest or physically present at time of search). For example, in *State v. Cortis*, 237 Neb. 97, 107, 465 N.W.2d 132 (1991), the Supreme Court of Nebraska held that the defendant did not have standing to challenge the search of his host's home even though he had previously stayed the night there because he was not a current overnight guest at the time of the search. In *Owens v. State*, 322 Md. 616, 627, 632 A.2d 797 (991), the Court of Appeals of Maryland found the defendant did not have standing in part because he was not a guest at the time of the search. In that case, the defendant occasionally visited his host, had previously spent the night, and had left his luggage at her apartment on the day of the search.

Dannebohm argues that as a welcome, regular guest who had made efforts to maintain his privacy, he had an expectation of privacy in Tracy's apartment even when he was not present. In support of his argument, Dannebohm cites to *United States v. Haydel*, 649 F.2d 1152 (5th Cir. 1981). In that case, the court held that the defendant had an expectation of privacy and, thus, standing to object to a search warrant that insufficiently described the premises to be searched. The police had searched the defendant's parents'

10

home, and the object of the search was the defendant's gambling records, which police found in a box under the defendant's parents' bed. 649 F.2d at 1154-55.

In determining whether the defendant had standing, the *Haydel* court considered factors such as

> "whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises." 649 F.2d at 1155.

The court noted that the defendant's parents had given him permission to use their home and had given him a key. The defendant kept clothes there and occasionally stayed overnight. Based on the record, the court reasoned the defendant likely had the authority to exclude others from the premises. The defendant also demonstrated "a subjective expectation that the contents of the box stowed under his parents' bed were to remain private." 649 F.2d at 1155. Based on the totality of the circumstances, the court held the defendant had a legitimate expectation of privacy in his parents' home. 649 F.2d at 1155.

Dannebohm contends that his case is similar to *Haydel*. He reasons he was a regular guest of Tracy's and kept a safe and a bag of clothing at her home. Dannebohm also had exhibited some expectation of privacy by keeping some of his belongings in a safe. Unlike *Haydel*, though, Dannebohm did not have a key to Tracy's apartment. The record does not demonstrate that Dannebohm had permission to enter the apartment in Tracy's absence, and it does not show that he had a right to exclude others from entering her apartment. Dannebohm had also never stayed overnight. And while he regularly visited Tracy, during some of those visits Dannebohm never even left his car. Moreover, Dannebohm did not hide his safe but, rather, allowed Tracy to use it as a TV stand. He also occasionally left the safe open where others would have access to its contents, and

11

Tracy testified that the combination was available somewhere in the apartment. Dannebohm did not take normal precautions to maintain his privacy in regard to the safe.

Dannebohm was not a current guest at the time of the search of Tracy's apartment. Dannebohm's connection to Tracy's apartment was also not so extensive that he had a reasonable expectation of privacy in the apartment even when he was not currently a guest. For these reasons, Dannebohm does not have standing to pursue a motion to suppress.

Dannebohm argues extensively that the district court was correct in ordering suppression of the evidence based on the fact that law enforcement's search exceeded the consent given by Tracy to search. However, based on the finding that Donnebohm did not having standing to contest the search, this argument is rendered moot.

Reversed and remanded.