IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 8, 2008 Session

## STATE OF TENNESSEE v. ERIC SHANE HELLER

**Direct Appeal from the Circuit Court for Weakley County**
**No. CR100-2006     William B. Acree, Jr., Judge**

---

**No. W2007-01455-CCA-R3-CD  - Filed July 24, 2008**

---

The defendant, Eric Shane Heller, was convicted of initiation of a process to manufacture methamphetamine and possession of methamphetamine with intent to manufacture, sell or deliver, both Class B felonies.  On appeal, the defendant argues that the trial court erred in finding that the defendant lacked standing to contest the search warrant which led to his arrest, that the evidence was insufficient to sustain his convictions, and that the trial court erred by issuing a jury instruction on the flight of the defendant.  Following our review of the parties' briefs, the record, and the applicable law, we reverse and vacate the judgments of the trial court and dismiss the defendant's convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed and Dismissed**

J.C. McLin, J., delivered the opinion of the court, in which John Everett Williams and Norma McGee Ogle, JJ., joined.

Jeffery T. Washburn, Dresden, Tennessee, for the appellant, Eric Shane Heller.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and Kevin McAlpin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  BACKGROUND

At trial, Marty Plunk testified that he was an investigator with the Weakley County Sheriff's Department on May 25, 2006, and was working with fellow investigator Randall McGowan to apprehend several individuals, including the defendant.  The defendant had an arrest warrant pending for violation of probation.  Officer Plunk was aware that the defendant was known to frequent an automobile repair shop owned by Chad Ferrell.  Officer Plunk had a description of the vehicle the defendant was driving and when the officers drove by the shop, they noticed the defendant's vehicle parked behind it.  Officers Plunk and McGowan parked close to the shop  to conduct surveillance.

Officer Plunk called and spoke with an attorney in the District Attorney's Office about obtaining a search warrant for the premises.

Officer Plunk testified that he observed the defendant's vehicle pulling out from behind the repair shop, and he believed that the defendant was in the car. Officers Plunk and McGowan stopped the car which was driven by the defendant's girlfriend, Sara Webb. Ms. Webb told the officers that nobody was in the shop and that shop employee Darrell Rogers had been there but had just left. Officers Plunk and McGowan left Ms. Webb in the company of a female investigator and went back to the shop and knocked on the door. The investigators noticed that Chad Ferrell's truck was also parked behind the shop, where it could not be seen from their prior observation point. After knocking and getting no response, Officers Plunk and McGowan walked around the shop, identified themselves loudly as police officers and started to look through windows and cracks in the walls. At this time, Officer Plunk called the District Attorney a second time. While making the call he noticed the odor of chemicals associated with a methamphetamine manufacturing laboratory. The police officers then opened a storm door on the southeast side of the shop and the odor became noticeably stronger. Officer Plunk called for support from other officers and returned to his office to draw up a formal search warrant which was approved by a judge. He radioed back to Officer McGowan who was still on the scene to notify him that he had obtained the warrant. Officer McGowan informed him that Chad Ferrell had left the shop and had been taken into custody. Mr. Ferrell told officers that there was no one else in the shop.

Officer Plunk testified that Officer McGowan terminated the phone call quickly after telling Officer Plunk that a four wheeler had just started up inside the building. Officer Plunk explained that by informing Officer McGowan that the search warrant was signed, Officer McGowan was authorized to enter the shop in order to prevent the destruction of evidence or to keep anyone from getting hurt. Officer Plunk returned to the shop after the officers on the scene had entered, set the search warrant down on a pool table inside the shop, and began searching the shop office for evidence of a methamphetamine laboratory.

Officer Plunk testified that he had received training regarding the manufacture of methamphetamine. Specifically, Officer Plunk had received training in how to dismantle a methamphetamine laboratory and how to separate the components for recovery by Drug Enforcement Agency (DEA) personnel. He estimated that he had participated in at least fifty investigations resulting in the dismantling of methamphetamine laboratories. Based on the smell around the shop office, Officer Plunk began his search in that area. Officer Plunk found a ladder in the shop and discovered a crawl space above the office. Using a pole, he was able to retrieve a camouflaged plastic bucket which had been pushed back into the crawl space. From a concealed spot next to the bucket, Officer Plunk also retrieved a white, ten-gallon garbage bag. As soon as he obtained the garbage bag, the strong chemical odor became even stronger. Officer Plunk took the garbage bag outside and set it on the pavement without opening it. Officer Plunk stated that he believed the contents of the bag were in the finishing process of methamphetamine manufacture.

Officer Plunk testified that the mixture found inside the bag was a pellet, powdery, white substance, wet and in a semi-liquid state. According to Officer Plunk, several components of methamphetamine manufacture were found in the bucket, including Liquid Fire, salt, plastic tubing,

2

and coffee filters. Some of the coffee filters were wet and contained the smell of a solvent chemical, possibly denatured alcohol or Coleman camp fuel. In addition, tinfoil strips were found inside a stove in the shop. The tinfoil strips were eight to ten inches long, two inches wide and folded in the center. Officer Plunk opined that methamphetamine users place the drug in the crease of the folded tinfoil, heat underneath the foil until it produces smoke which is then inhaled using a crude tool such as an ink pen tube or old car antenna. Officer Plunk stated that several of the tinfoil strips appeared to be used. Officer Plunk also noted that needles, syringes, and scales were found inside the shop.

Officer Plunk testified that he found batteries in a trash can in the shop. The lithium strips had been removed from the batteries and used. Officer Plunk stated that the white garbage bag and its contents were placed into a bio-hazard evidence bag and sealed. Also among the recovered items were more than fifty Ziploc bags with the corners cut out. Officer Plunk stated that methamphetamine was frequently placed in the bags, twisted into a teardrop shape and sold. Officer Plunk contacted Special Agent Mike Woodham of the DEA and informed him that Mr. Ferrell and the defendant had been arrested. The following day, Agent Woodham took possession of the seized materials for analysis. The most dangerous components of the methamphetamine manufacture process were documented and then destroyed in compliance with the law. Officer Plunk further testified that anyone inside the building at the time he and Officer McGowan were yelling, identifying themselves as police officers, and attempting to gain entry, would have clearly been able to hear them.

On cross-examination, Officer Plunk testified that there was an outstanding warrant for the defendant's arrest and stated that the defendant knew that police were looking for him. Officer Plunk also stated that one of the vehicles found inside the shop belonged to Sara Webb. Officer Plunk testified that the manufacturing process used by the defendant was commonly described as the Nazi or Birch method. Officer Plunk opined that the ammonia was used late in the process to bind the lithium battery strips with the stripped down ephedrine. He further testified that in either the Birch or Nazi method, anhydrous ammonia was required to complete the process. Officer Plunk admitted that no anhydrous ammonia was seized at the crime scene, but Officer Plunk stated that he smelled a combination of anhydrous ammonia and Coleman camp fuel emanating from the white garbage bag. Officer Plunk also acknowledged that in the search warrant affidavit he indicated that he smelled odors related to the production of methamphetamine, "including but not limited to, anhydrous ammonia, ether, denatured alcohol." However, no containers were found in the shop which held any of those components. Officer Plunk asserted that the smells of those substances were present and emanated from the white plastic garbage bag. Officer Plunk also noted that an empty, clear, plastic container was found inside the plastic camouflage bucket. Officer Plunk said that he believed that the chemicals present in that plastic container were poured into the white plastic bag during the manufacturing process. Officer Plunk clarified that camp fuel, denatured alcohol or ether could be used interchangeably in the methamphetamine manufacturing process. Officer Plunk acknowledged that no hydrogen chloride gas generator was seized during the investigation. He further acknowledged that a hydrogen chloride gas generator was generally required to transform methamphetamine liquid and gases into powder flakes or "crystals" for consumption.

Officer Plunk testified that the shop owner, Chad Ferrell, was the subject of an ongoing DEA investigation and admitted to having manufactured several pounds of methamphetamine. Officer

3

Plunk stated that a chemical heat reaction was occurring inside the white plastic bag. Police officers moved the bag outside and set it on the pavement. When the garbage bag was placed inside the bio-hazard evidence bag, officers noticed that the pavement underneath the garbage had turned black. Officer Plunk admitted that no Sudafed or ephedrine was recovered from the shop. Officer Plunk stated that the defendant did not have an ownership interest in the shop. Officer Plunk testified that with the proper components, methamphetamine could be manufactured within two to four hours. Officer Plunk stated that investigators were unable to tell whether the material in the garbage bag was ready to be laid out to dry or whether it was still processing.

Randall McGowan testified that he and Officer Plunk observed the shop belonging to Chad Ferrell and stopped a vehicle they believed belonged to the defendant after it left the premises. After questioning Sara Webb, the defendant's girlfriend, he and Officer Plunk went back to the shop and attempted to locate the defendant. Officer McGowan testified that he opened a storm door on the exterior of the building which led into the office. As soon as he opened the storm door, he smelled the strong chemical odor associated with methamphetamine manufacture.

Officer McGowan testified that Officer Plunk left to obtain a search warrant. After Officer Plunk left, Chad Ferrell emerged from the building and was taken into custody. Mr. Ferrell informed the police officers that no one else was in the building. Officer McGowan and other officers on the scene waited about an hour until Officer Plunk called Officer McGowan and told him that the search warrant had been signed. As he waited for authorization to enter the premises, Officer McGowan stated that he heard a vehicle, believed by the officers to be a four-wheeler or motorcycle, start up and run for a while before being shut off by someone inside. After Officer Plunk called and indicated that the warrant had been executed, Mr. Ferrell provided Officer McGowan with a key to the office door. As Officer McGowan went to open the door, the defendant opened it from the inside and was taken into custody. Officer McGowan testified that the odor of methamphetamine manufacture was so strong that officers had to open the sliding bay doors to the shop to ventilate it before conducting their search.

On cross-examination, Officer McGowan stated that when he entered the shop, he did not notice if there were paint cans or gas cans or other items which could generate an odor. He stated that what he mainly noticed was the strong smell of methamphetamine manufacture; anhydrous ammonia, ether and denatured alcohol. Officer McGowan admitted that police did not find any containers holding any of those substances. He stated that Mr. Ferrell had a history of involvement with methamphetamine. Officer McGowan also stated that he was familiar with an investigation involving Mr. Ferrell wiring large sums of money to California. Officer McGowan admitted that the majority of the items attributed to the manufacture of methamphetamine were located in the ceiling above the office, although a few items, including the lithium battery strips, had been burned in a wood stove near the office. However, the stove was cold and Officer McGowan was able to reach in and retrieve the lithium battery strips. Officer McGowan testified that a few items were found outside underneath a concrete slab.

Mike Woodham testified that he was a Special Agent with the United States Drug Enforcement Administration (DEA). He stated that the federal government was already involved in an ongoing investigation of Chad Ferrell for the distribution of significant quantities of

methamphetamine. Since DEA officers were already working on a case against Mr. Ferrell, it was agreed that Agent Woodham would take any new case and combine it with the pending case. He stated that he came to the crime scene and picked up the evidence directly from Officer Plunk. Special Agent Woodham testified that the seized substances were sent to Miami for testing. He also stated that the DEA was waiting on the U.S. Attorney's Office to take the case to the grand jury.

On cross-examination, Agent Woodham testified that his department had been involved in at least one investigation of Mr. Ferrell prior to this incident. Agent Woodham was aware that Mr. Ferrell had received shipments of drugs from California, and in exchange, had sent large quantities of money back. Agent Woodham stated that as a general rule, his decision as to whether to conduct an investigation was based on what the United States Attorney's Office wanted to prosecute.

Elizabeth Atkins testified that she was a forensic chemist with the DEA and had performed a gas chromatograph mass spectrometer and infrared spectrophotometer analysis of the substance sent to her by Special Agent Woodham. She stated that the substance weighed 76.8 grams and that the substance contained methamphetamine, a Schedule II drug. Ms. Atkins explained that Schedule I drugs were the most addictive and had no medicinal value. She further explained that as the Schedule number of a drug increases, that drug is generally considered less addictive and correspondingly, possesses an increased medicinal value.

On cross-examination, Ms. Atkins testified that the amount of methamphetamine contained in the substance was believed to be less than one percent. She stated that if any amount of methamphetamine was present in the substance, she was obligated to report it, no matter how small a quantity. She also testified that the substance did not contain, as far as she could see, any anhydrous ammonia. The substance was an off-white powder when she received it. Ms. Atkins described the substance as an "inert substance" with a very small quantity of methamphetamine in it.

Pam Belew testified that she was the Circuit Court Clerk for Weakley County. She stated that in May of 2006, the defendant was arrested and appeared in General Sessions court before being released on bond. Later that year, the court record indicated that Judge William B. Acree issued a capias warrant and revoked the bond for the defendant after he failed to appear for a court-ordered report date on October 26, 2006. She stated that the defendant appeared at all other scheduled hearings prior to the October 26, 2006 hearing date.

Darrell Rogers testified that he was a mechanic who worked at the shop owned by Chad Ferrell. He stated that he worked on a car owned by Sara Webb on May 25, 2006 and that the defendant would meet him to assist him with the car. He stated that Ms. Webb's car was located inside the shop and had been there for two or three weeks because parts had been ordered from overseas. He stated that the white Mercury Cougar that Officers Plunk and McGowan had identified as belonging to the defendant had actually been loaned to Ms. Webb while her car was being repaired.

Sara Webb testified that she was dating the defendant at the time and had been at the shop on May 25, 2006. She stated that at around 1:00 or 1:30 p.m., she arrived at the shop and observed

Chad Ferrell coming out of the woods behind the shop with a bucket and a backpack. She followed Mr. Ferrell into the shop and saw the defendant in the shop office. She stated that Darrell Rogers was supposed to be working on her car that day and that the defendant was there to help him. However, Darrell Rogers was not at the shop at that time. She stated that she and the defendant had been to the shop on previous occasions while her car was being worked on.

Ms. Webb testified that at one point she and the defendant walked into the shop and observed Mr. Ferrell spray painting the bucket he had carried in from the woods. Ms. Webb was familiar with the smell of a methamphetamine lab. She stated that the shop did not smell like a methamphetamine laboratory, and she did not observe the manufacturing of any methamphetamine. However, she was able to smell the spray paint used by Mr. Ferrell to paint the bucket. She stated that she was only at the shop for twenty or thirty minutes before leaving. She admitted that soon after leaving the shop, she was pulled over by Officers Plunk and McGowan and she told them that the defendant was not present at the shop. She admitted that she had used methamphetamine in the past but had received successful treatment to get off of the drug. Ms. Webb testified that she and the defendant ended their relationship some time prior to trial. She stated that she never saw what Mr. Ferrell did with the bucket after painting it or what was in the bucket. She also stated that she never saw the defendant with the bucket or the backpack in his possession.

On cross-examination, Ms. Webb testified that she lied to the officers about the defendant's presence at the shop because she knew there was a warrant out for his arrest. She stated that the defendant rode with Mr. Ferrell to the shop that day. Ms. Webb did not know whether the defendant had been out in the woods with Mr. Ferrell prior to her arrival. She stated that it was commonplace for methamphetamine manufacturers to complete at least some of the manufacturing process in the woods before moving the final stages of the process indoors. Ms. Webb stated on re-cross examination that although she had an idea as to what Mr. Ferrell was doing with the bucket and the backpack, she did not ask any questions.

The defendant testified that on May 25, 2006, he received a call from Mr. Ferrell informing him that the last of the parts needed to complete a repair of Ms. Webb's vehicle had arrived. Mr. Ferrell agreed to pick the defendant up and bring him to the shop where he was going to meet Darrell Rogers to work on the car. The defendant testified that his original plan was to simply provide the parts to Mr. Rogers and then leave. However, Mr. Rogers did not arrive for some time, and in the interim, Ms. Webb came to see him about depositing money in the bank. The defendant stated that he knew that Officers Plunk and McGowan were looking for him. He asked Mr. Ferrell if he had anything illegal in his shop and told Mr. Ferrell that the police were looking for him based on an outstanding arrest warrant.

The defendant testified that when Mr. Ferrell brought the bucket and the backpack into the building, he had a bad feeling and instructed Ms. Webb to go ahead and leave without him. He stated that if he had been caught with Ms. Webb, it would have been a violation of her probation. He stated that after Ms. Webb left, he was pretty much stuck at the shop without a way to leave. According to the defendant, he attempted to call Mr. Rogers to tell him to come on up to the shop. The defendant stated that after Ms. Webb's departure, he heard about her stop on a police scanner inside the shop. Within ten to fifteen minutes of Mr. Ferrell bringing the bucket and backpack into

6

the shop, police surrounded the building and were knocking on the door. The defendant refused to open the door because of the warrant for his arrest. The defendant reiterated several times that he had no interest in the business and that his only involvement with Mr. Ferrell was that he let him work on Ms. Webb's car. He did not see any anhydrous ammonia or usable lithium strips in the shop. He also did not smell anhydrous ammonia or ether. The defendant did not see a white plastic garbage bag and did not know anything about the items placed above the office in the crawl space.

The defendant testified that the warrant for his arrest pertained to a misdemeanor probation violation for possession of less than a quarter ounce of marijuana. Specifically, the defendant failed to appear for a meeting with his probation officer regarding the marijuana violation. The defendant stated that because he knew officers had a warrant for his arrest, he was not going to voluntarily surrender himself to authorities. The defendant stated that the reason that he did not appear for his scheduled court-ordered hearing on October 26, 2006 was because he learned from his attorney that he would be arrested at the courthouse for outstanding warrants originating in Kentucky. He testified that he had come to court for all of his other court appearances while out on bond.

The defendant testified that he was not involved in initiating a process of methamphetamine manufacture. He stated that he had not been out in the woods with Mr. Ferrell at any point on May 25, 2006. He stated that he was in the office for about an hour-and-a-half before Ms. Webb arrived.

On cross-examination, the defendant testified that during a portion of the time he was waiting for Mr. Rogers, he and Mr. Ferrell worked on the cylinder head he was planning to install in Ms. Webb's car. He stated that although it was approximately one hundred degrees in the shop, he did not open the large bay doors to the shop for ventilation and did not spend much time working on the cylinder. In the time remaining before Ms. Webb arrived, the defendant waited in the air-conditioned office while Mr. Ferrell went in and out of the building. The defendant informed Mr. Ferrell that the police were looking for him. Mr. Ferrell assured him that the shop was clean and told him "that there was nothing illegal or messed up in the shop." The defendant testified that he started the four-wheeler because he thought about escaping, and he believed that he had been set up by Mr. Ferrell.

The defendant testified that he had previously been arrested for possession of methamphetamine. He stated that he had cooperated and assisted police officers in the past and had those charges had been removed. With regard to the outstanding arrest warrant for his probation violation, the defendant stated that he had been in contact with his bail bondsman and "was going to take care of it" sooner or later.

After deliberation, the jury found the defendant guilty of initiation of a process to manufacture a controlled substance and for possession with intent to manufacture, sell or deliver methamphetamine, both Class B felonies. The defendant received a twelve-year sentence for each conviction. In addition, the defendant was fined $2,000.

## II. ANALYSIS

On appeal, the defendant argues that the trial court erred by failing to grant the defendant's motion to suppress, that there was insufficient evidence to sustain the convictions against the defendant, and that the trial court erred by giving a flight instruction to the jury.

## A. Motion to Suppress

The defendant filed a pre-trial motion to suppress and argued that the search warrant was invalid because the grounds stated by the affiant, Officer Plunk, were fraudulently or recklessly made. The trial court denied the defendant's motion and determined that the defendant lacked standing to contest the warrant and that Officer Plunk's statements were proper.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the state, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23. "In evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The defendant argues that he had standing to contest the validity of the search warrant because the warrant listed him personally as an individual, and as such, he had an expectation of privacy in his person. One who challenges the reasonableness of a search or seizure has the initial burden of establishing a legitimate expectation of privacy in the place to be searched. *State v. Oody*, 823 S.W.2d 554, 560 (Tenn. Crim. App. 1991). One who does not have such an expectation of privacy lacks "standing" to challenge the search. *See State v. Patterson*, 966 S.W.2d 435, 441 n. 5 (Tenn. Crim. App. 1997). A person who is a "casual visitor" or a "transient party guest" does not have a reasonable expectation of privacy in the host's residence or apartment. *See United States v. Dix*, No. 94-4065, 1995 WL 351182 (6th Cir., June 9, 1995) ("As a casual, albeit frequent, visitor to his sister's apartment, who did not keep clothing there, who did not receive mail there, and who had no key, Dix had no reasonable expectation of privacy in the premises."). There are seven factors to be considered when determining if a legitimate expectation of privacy exists:

> (1) ownership of the property; (2) whether the defendant has a possessory interest in the thing seized; (3) whether the defendant has a possessory interest in the placed [sic] searched; (4) whether the defendant has the right to exclude other[s] from the place; (5) whether he has exhibited a subjective expectation that the place would remain free from intrusion by the state; (6) whether the defendant took normal precautions to maintain his privacy; and (7) whether he was legitimately on the premises.

*Oody*, 823 S.W.2d at 560 (citing *United States v. Haydel*, 649 F.2d 1152 (5th Cir. 1981)).

The trial court determined that the defendant lacked standing to challenge the search warrant. We conclude that the evidence preponderates against the finding of the trial court only with regard to the defendant's standing to challenge the search of his person. Because the defendant was directly identified as the object of the search warrant, he possesses the requisite standing to challenge a search of his person. An individual has a reasonable expectation of privacy in his or her person. *State v. Cothran*, 115 S.W.3d 513, 521 (Tenn. Crim. App. 2003) (citing *State v. Transou*, 928 S.W.2d 949, 958 (Tenn. Crim. App. 1996)). However, we conclude that the evidence does not preponderate against the trial court's ruling that he lacked standing to challenge a search of the property belonging to Mr. Ferrell because he had no reasonable expectation of privacy or a possessory interest in the property. The defendant was not an owner of the shop, he had no possessory interest in the shop, no right to exclude others from entering, and no reasonable expectation that the shop would remain free from governmental invasion. *See Oody*, 823 S.W.2d at 560. In our view, of the seven factors enumerated in *Oody*, the defendant only qualified under factor (7), that he was legitimately on the premises. *See id*. The defendant was legitimately on the premises because he was picked up by Mr. Ferrell who brought him to the shop to work on Ms. Webb's car. However, it is clear from the evidence and from the defendant's own statements that he was only on the premises as a "casual visitor." *See Dix*, 1995 WL 351182 at *2. The defendant stated at trial:

> I don't have - it's not my business. I don't have no interest in the business. Chad [Ferrell] let's me park a vehicle, or work on a vehicle there, or something like that. But other than that, I have no interest in this shop. I have no control over what he's hid in his shop or what he does in his shop.

Therefore, we conclude that the trial court did not err in determining that defendant lacked standing to challenge the search of the property or premises on which methamphetamine and contraband were discovered. Even though the defendant had standing to challenge the search of his person, he still lacked standing to challenge the search of the property, and because the incriminating drug-related materials were found on the property and not on the defendant's person, we need not address the validity of the search warrant on its merits.

## B. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to sustain his convictions for initiation of methamphetamine manufacture and for possession of methamphetamine with intent to deliver.

Upon review, we reiterate the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to the appellate court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could

9

have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict, approved by the trial judge, accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

A defendant may be convicted on the basis of direct or circumstantial evidence or a combination of both. *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); *see also State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987). However, the circumstantial evidence "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id.* at 613.

"Possession" may be actual or constructive and may be proven by circumstantial evidence. *See State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001); *State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000). Constructive possession requires proof that a person had the power and intention at a given time to exercise dominion and control over the drugs either directly or through others. *Shaw*, 37 S.W.3d at 903 (citing *State v. Patterson*, 966 S.W.2d 435, 444 (Tenn. Crim. App. 1997)). In essence, "constructive possession is the ability to reduce an object to actual possession." *State v. Ross*, 49 S.W.3d 833, 845-46 (Tenn. 2001) (citations omitted). However, the mere presence in an area where drugs are discovered, or the mere association with a person who is in possession of drugs, is not, alone, sufficient to support a finding of constructive possession. *Shaw*, 37 S.W.3d at 903 (citing *Patterson*, 966 S.W.2d at 445). The intention to sell or deliver drugs may be inferred from the amount of the drug possessed by the accused along with other relevant facts surrounding the arrest. *See* Tenn. Code Ann. § 39-17-419; *see also State v. John Fitzgerald Belew*, W2004-01456-CCA-R3-CD, 2005 WL 885106, *5 (Tenn. Crim. App., at Jackson, Apr. 18, 2005) (noting that the jury can infer intent to sell or deliver when amount of controlled substance and other relevant facts surrounding arrest are considered together).

### 1. Initiation of A Process to Manufacture Methamphetamine

In the instant case, the defendant was convicted of one count of initiation of a process to manufacture methamphetamine. Tennessee Code Annotated section 39-17-435 states in pertinent part:

(a) It is an offense for a person to knowingly initiate a process intended to result in the manufacture of any amount of methamphetamine.

(b) It shall not be a defense to a violation of this section that the chemical reaction is not complete, that no methamphetamine was actually created, or that the process would not actually create methamphetamine if completed.

(c) For purposes of this section, "initiates" means to begin the extraction of an immediate methamphetamine precursor from a commercial product, to begin the active modification of a commercial product for use in methamphetamine creation, or to heat or combine any substance or substances that can be used in methamphetamine creation.

(d) Expert testimony of a qualified law enforcement officer shall be admissible for the proposition that a particular process can be used to manufacture methamphetamine. For purposes of this testimony, a rebuttable presumption is created that any commercially sold product contains or contained the product that it is represented to contain on its packaging or labels.

(e) A person may not be prosecuted for a violation of this section and of manufacturing a controlled substance in violation of § 39-17-417 based upon the same set of facts.

Tenn. Code Ann. §39-17-435(a)-(e).


When viewed in a light most favorable to the prosecution, we conclude that the evidence was not sufficient to sustain the defendant's conviction for initiation of a process to manufacture methamphetamine. We do not dispute that the prosecution was able to demonstrate several of the required statutory elements for initiating the manufacture of methamphetamine. The record reflects that police officers discovered raw materials and commercial products in Ferrell's shop which could be used as precursor ingredients and components in the methamphetamine manufacturing process. The white garbage bag recovered by police officers clearly contained chemicals and ingredients undergoing a chemical reaction. *See* Tenn. Code Ann. § 39-17-435(c). It is immaterial that only trace amounts of methamphetamine were detected in the substance located in the white garbage bag. *See id*. at (b). In addition, Officer Plunk was able to provide expert testimony regarding the methamphetamine manufacturing process based on his training and experience. *See id*. at (d).

However, the prosecution failed to establish that the defendant was the individual responsible for violating the statute. First, the defendant had no possessory interest in the shop where the substances and drug-making materials were discovered. Second, no drugs, drug manufacturing materials or other items were found on the defendant's person. Third, and perhaps most importantly, no proof was presented that showed that the recovered substances and drug materials were in the defendant's actual or constructive possession or that he was involved in any preparation, modification, or extraction process to manufacture methamphetamine. *See State v. Williams*, 623

11

S.W.2d 121, 125 (Tenn. Crim. App. 1981); *see also Cooper*, 736 S.W.2d at 129. Fourth, testimony and other evidence offered at trial implicated Mr. Ferrell, the actual owner of the property where the commercial precursor products and semi-liquid, methamphetamine substance were discovered. Any inference of possession arising from the recovered materials should be imputed to Mr. Ferrell rather than to the defendant. *See Transou*, 928 S.W.2d at 956. Fifth and finally, the evidence demonstrated that Mr. Ferrell may have initiated the methamphetamine manufacturing process in the woods prior to the arrival of police officers, and without any involvement by the defendant. Because the record is devoid of evidence establishing the defendant possessed the substances found or participated in a process to manufacture methamphetamine. The prosecution failed to prove the defendant's guilt pursuant to Tennessee Code Annotated section 39-17-435.

Because there was no indication that the defendant possessed the drugs, his mere presence at the shop or his association with Mr. Ferrell is insufficient to support a finding that the defendant possessed the drugs. *See Cooper*, 736 S.W.2d at 129; *Dishman v. State,* 460 S.W.2d 855, 858 (Tenn. Crim. App. 1970). Clearly, the evidence does not exclude every other reasonable explanation and is not sufficient to permit the jury to infer that the defendant was guilty beyond a reasonable doubt. *See Crawford*, 470 S.W.2d at 612-613. As such, we conclude that the evidence was insufficient to permit a rational trier of fact to sustain the defendant's conviction for initiation of methamphetamine manufacture beyond a reasonable doubt. Therefore, we reverse the defendant's conviction for initiation of a process to manufacture methamphetamine.

## 2. Possession with Intent to Sell or Deliver

The defendant was also convicted of possession of methamphetamine with intent to sell or deliver.

Before we consider whether the evidence was sufficient to sustain the defendant's conviction on this charge, we are compelled to address an error committed by the prosecution when it charged the defendant under both Tennessee Code Annotated sections 39-17-435 and 39-17-417. Specifically, Tennessee Code Annotated section 39-17-435(e) states that "[a] person may not be prosecuted for a violation of this section and of manufacturing a controlled substance in violation of § 39-17-417 based upon the same set of facts." In addition, Tennessee Pattern Jury Instruction 31.15, Comment 2, states that "[a] person may not be prosecuted for a violation of [Tenn. Code Ann. § 39-17-435] and also for a violation of [Tenn. Code Ann. § 39-17-417]." Although we are unaware of a case in which this specific statutory conflict has been addressed, it appears from the plain language of section 39-17-435 that the prosecution erred by trying the defendant under both statutes.

Notwithstanding the error committed by the prosecution, we review the record to determine whether the evidence was sufficient to sustain the defendant's conviction. Tennessee Code Annotated section 39-17-417(a)(4) provides that "(a) [i]t is an offense for a defendant to knowingly . . . . (4) possess a controlled substance with intent to manufacture, deliver or sell the controlled substance." "Delivery" is statutorily defined as "the actual, constructive, or attempted transfer from one person to another of a controlled substance." Tenn. Code Ann. § 39-17-402(6). This court has previously concluded that the trier of fact is entitled to consider the circumstances surrounding a "delivery" in order to determine if the defendant actually sold or delivered drugs:

12

With regard to a determination of the defendant's intent to sell or deliver, proof of intent usually consists of circumstantial evidence and the inferences that can be reasonably drawn from that evidence. *See Hall v. State*, 490 S.W.2d 495, 496 (Tenn.1973); *State v. Charles Benson*, No. M2003-02127-CCA-R3-CD, 2004 WL 2266801, at *2 (Tenn. Crim. App. at Nashville, Oct. 8, 2004) (noting that the defendant's culpable mental state is most often proven by circumstantial evidence and inferences drawn from the surrounding circumstances).

*Belew*, 2005 WL 885106 at *5. As noted previously, in order for the jury to draw an inference supporting an intent to sell or deliver, jurors may only do so "when the amount of the controlled substance and other relevant facts surrounding the arrest are considered together." *Id.*

A threshold issue before this court is a determination of whether the defendant knowingly possessed the drugs with intent to manufacture, sell or deliver. As previously noted, a defendant's mere presence in an area where drugs or paraphernalia are discovered does not show possession. *Cooper*, 736 S.W.2d at 129; *see also Whited v. State*, 483 S.W.2d 594 (Tenn. Crim. App. 1972); *Dishman v. State*, 460 S.W.2d 855, 858 (Tenn. Crim. App. 1970). Likewise, mere association with a person who controls the drugs or property where the drugs are discovered is not sufficient to support a finding that the person possessed the drugs. *Id.*

In the instant case, the record is devoid of evidence establishing the defendant's actual or constructive possession of any of the recovered materials or components to the substance in the white garbage bag or to any aspect of the manufacturing process. *See Williams*, 623 S.W.2d at 125; *see also Cooper*, 736 S.W.2d at 129. The record is devoid of any facts which would allow the jury to infer that the defendant, and not Mr. Ferrell, was the individual who possessed and controlled the materials recovered during the search or was the person responsible for mixing the chemicals in the white garbage bag. Because it is impossible to ascertain whether the defendant was in possession of those materials, much less involved in the manufacture of the substance, it is even more difficult to infer beyond a reasonable doubt that the defendant possessed the requisite intent to sell or deliver the substance. Furthermore, Elizabeth Atkins, the DEA's forensic chemist, could only testify that the trace amount of methamphetamine recovered from the substance in the white garbage bag was less than one percent of the total 76.8 gram amount. This amount was so negligible as to almost be unascertainable, and in our view, did not constitute a meaningful quantity for purposes of sale or delivery. In addition, Ms. Atkins was unable to discern what stage of the manufacturing process had been completed after analyzing the substance. Testimony was offered demonstrating that officers were unable to find the necessary chemicals and essential machinery which would have been used to complete the process and render it ready for use. Specifically, police officers were unable to locate a hydrogen gas generator or anhydrous ammonia, two key components used in the end stages of the manufacturing process. Therefore, we conclude that the defendant is entitled to dismissal of his conviction for possession of methamphetamine with intent to manufacture, sell or deliver.

## C. Flight Instruction

The defendant contends that the trial court committed reversible error by instructing the jury on flight. Specifically, the defendant argues that the flight instruction to the jury created an impermissible, rebuttable inference of guilt. However, having already concluded that the defendant's convictions should be reversed, we decline to address the propriety of the trial court's instruction on flight or to address the question of whether any error committed by the court in issuing such an instruction constituted reversible error.

## CONCLUSION

For the aforementioned reasons, the judgments of the trial court are reversed and the case is dismissed.

_____
J.C. McLIN, JUDGE